## SUMITOMO SHOJI AMERICA, INC. *v.*
## AVAGLIANO ET AL.

No. 80–2070.   Argued April 26, 1982—Decided June 15, 1982*

---

*Together with No. 81–24, *Avagliano et al.* v. *Sumitomo Shoji America, Inc.*, also on certiorari to the same court.

BURGER, C. J., delivered the opinion for a unanimous Court.

*Abram Chayes* argued the cause for petitioner in No. 80–2070 and respondent in No. 81–24. With him on the briefs were *J. Portis Hicks, Jiro Murase,* and *Carl J. Green.*

*Lewis M. Steel* argued the cause and filed a brief for respondents in No. 80–2070 and petitioners in No. 81–24.

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Assistant Attorney General Reynolds, Edwin S. Kneedler, Brian K. Landsberg,* and *Michael J. Connolly.*†

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether Article VIII(1) of the Friendship, Commerce and Navigation Treaty between

---

†*John R. Horan* filed a brief for the Japan External Trade Organization as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Nathan Z. Dershowitz* for the American Jewish Congress et al.; by *Thomas I. Atkins* for the National Association for the Advancement of Colored People; and by *Edward John O'Neill, Jr.,* for Michael E. Spiess et al.

Briefs of *amici curiae* were filed by *Robert Abrams,* Attorney General, *pro se, Shirley Adelson Siegel,* Solicitor General, and *Peter G. Crary,* Assistant Attorney General, for the Attorney General of the State of New York; by *Robert D. Owen* for the Ministry of International Trade and Industry of the Government of Japan; by *John K. Weir* for the East Asiatic Co., Ltd., et al.; by *Neil Martin* for C. Itoh & Co. (America), Inc.; and by *John R. Hupper* and *Paul M. Dodyk* for Shell Petroleum N.V.

the United States and Japan provides a defense to a Title VII employment discrimination suit against an American subsidiary of a Japanese company.

# I

Petitioner, Sumitomo Shoji America, Inc., is a New York corporation and a wholly owned subsidiary of Sumitomo Shoji Kabushiki Kaisha, a Japanese general trading company or *sogo shosha*.[1] Respondents are past and present female secretarial employees of Sumitomo.[2] All but one of the respondents are United States citizens; that one exception is a Japanese citizen living in the United States. Respondents brought this suit as a class action claiming that Sumitomo's alleged practice of hiring only male Japanese citizens to fill executive, managerial, and sales positions violated both 42 U. S. C. § 1981 and Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.* (1976 ed. and Supp. IV).[3] Respondents sought both injunctive relief and damages.

---

[1] General trading companies have been a unique fixture of the Japanese economy since the Meiji era. These companies each market large numbers of Japanese products, typically those of smaller concerns, and also have a large role in the importation of raw materials and manufactured products to Japan. In addition, the trading companies play a large part in financing Japan's international trade. The largest trading companies—including Sumitomo's parent company—in a typical year account for over 50% of Japanese exports and over 60% of imports to Japan. See Krause & Sekiguchi, Japan and the World Economy, in Asia's New Giant: How the Japanese Economy Works 383, 389–397 (H. Patrick & H. Rosovsky eds. 1976).

[2] Respondents have also filed a cross-petition in this case. Thus, the past and present secretaries, generally referred to as respondents, are the respondents in No. 80–2070 and the cross-petitioners in No. 81–24. Sumitomo is the petitioner in No. 80–2070 and the cross-respondent in No. 81–24.

[3] Prior to bringing this suit, respondents each filed timely complaints with the Equal Employment Opportunity Commission. The EEOC issued

Without admitting the alleged discriminatory practice, Sumitomo moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint. Sumitomo's motion was based on two grounds: (1) discrimination on the basis of Japanese citizenship does not violate Title VII or § 1981; and (2) Sumitomo's practices are protected under Article VIII(1) of the Friendship, Commerce and Navigation Treaty between the United States and Japan, Apr. 2, 1953, [1953] 4 U. S. T. 2063, T. I. A. S. No. 2863. The District Court dismissed the § 1981 claim, holding that neither sex discrimination nor national origin discrimination are cognizable under that section. 473 F. Supp 506 (SDNY 1979). The court refused to dismiss the Title VII claims, however; it held that because Sumitomo is incorporated in the United States it is not covered by Article VIII(1) of the Treaty. The District Court then certified for interlocutory appeal to the Court of Appeals under 28 U. S. C. § 1292(b) the question of whether the terms of the Treaty exempted Sumitomo from the provisions of Title VII.

The Court of Appeals reversed in part. 638 F. 2d 552 (CA2 1981). The court first examined the Treaty's language and its history and concluded that the Treaty parties intended Article VIII(1) to cover locally incorporated subsidiaries of foreign companies such as Sumitomo. The court then held that the Treaty language does not insulate Sumitomo's executive employment practices from Title VII scrutiny. The court concluded that under certain conditions, Japanese citizenship could be a bona fide occupational qualification for high-level employment with a Japanese-owned domestic corporation and that Sumitomo's practices might

---

"right to sue" letters to the respondents on October 27, 1977. This suit was filed on November 21, 1977, well within the statutory 90-day period allowed for filing suits after receipt of an EEOC notice of right to sue. 42 U. S. C. § 2000e–5(f)(1).

thus fit within a statutory exception to Title VII.[4] The court remanded for further proceedings.[5]

We granted certiorari, 454 U. S. 962 (1981), and we vacate and remand.

## II

Interpretation of the Friendship, Commerce and Navigation Treaty between Japan and the United States must, of course, begin with the language of the Treaty itself. The clear import of treaty language controls unless "application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." *Maximov* v. *United States*, 373 U. S. 49, 54 (1963). See also *The Amiable Isabella*, 6 Wheat. 1, 72 (1821).

---

[4] Sumitomo argued in the District Court that discrimination on the basis of national citizenship, as opposed to national origin, was not prohibited by Title VII. The District Court disagreed, however. It relied on *Espinoza* v. *Farah Manufacturing Co.*, 414 U. S. 86, 92 (1973), in which we noted that "Title VII prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin." Although discussed at length in the briefs, this issue is not properly before the Court and we do not reach it. It was not included in the question certified for interlocutory review by the Court of Appeals under 28 U. S. C. § 1292(b), was not decided by the Court of Appeals, and was not set forth or fairly included in the questions presented for review by this Court as required by Rule 21.1(a).

[5] In a nearly identical case, a divided panel of the Court of Appeals for the Fifth Circuit came to somewhat contrary results. *Spiess* v. *C. Itoh & Co.*, 643 F. 2d 353 (1981), cert. pending, No. 81–1496. The Fifth Circuit majority agreed with the Second Circuit decision that a locally incorporated subsidiary of a Japanese corporation is covered by Article VIII(1) of the Treaty, but disagreed with the latter court's decision on the effect of the Treaty on Title VII. The court held that the Treaty provision did protect the subsidiary's practices from Title VII liability.

In dissent, Judge Reavley disagreed with the majority's initial conclusion. He would have held that under the plain language of the Treaty, locally incorporated subsidiaries are to be considered domestic corporations and are thus not covered by Article VIII(1).

Article VIII(1) of the Treaty provides in pertinent part:

> "[C]ompanies of either Party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents and other specialists of their choice." (Emphasis added.)[6]

---

[6] Similar provisions are contained in the Friendship, Commerce and Navigation Treaties between the United States and other countries. See, e. g., Article XII(4) of the Treaty with Greece, [1954] 5 U. S. T. 1829, 1857, T. I. A. S. No. 3057 (1951); Article VIII(1) of the Treaty with Israel, [1954] 5 U. S. T. 550, 557, T. I. A. S. No. 551 (1951); Article VIII(1) of the Treaty with the Federal Republic of Germany, [1956] 7 U. S. T. 1839, 1848, T. I. A. S. No. 3593 (1954).

These provisions were apparently included at the insistence of the United States; in fact, other countries, including Japan, unsuccessfully fought for their deletion. See, e. g., State Department Airgram No. A–453, dated Jan. 7, 1952, pp. 1, 3, reprinted in App. 130a, 131a, 133a (discussing Japanese objections to Article VIII(1)); Foreign Service Despatch No. 2529, dated Mar. 18, 1954, reprinted in App. 181a, 182a (discussing German objections to Article VIII(1)).

According to Herman Walker, Jr., who at the time of the drafting of the Treaty served as Adviser on Commercial Treaties at the State Department, Article VIII(1) and the comparable provisions of other treaties were intended to avoid the effect of strict percentile limitations on the employment of Americans abroad and "to prevent the imposition of ultranationalistic policies with respect to essential executive and technical personnel." Walker, Provisions on Companies in United States Commercial Treaties, 50 Am. J. Int'l L. 373, 386 (1956); Walker, Treaties for the Encouragement and Protection of Foreign Investment: Present United States Practice, 5 Am. J. Comp. L. 229, 234 (1956). According to the State Department, Mr. Walker was responsible for formulation of the postwar form of the Friendship, Commerce and Navigation Treaty and negotiated several of the treaties for the United States. Department of State Airgram A–105, dated Jan. 9, 1976, reprinted in App. 157a.

See also Foreign Service Despatch No. 2529, supra, App. 182a (Purpose of Article VIII(1) of Treaty with Germany "is to preclude the imposition of 'percentile' legislation. It gives freedom of choice as among persons lawfully present in the country and occupationally qualified under the local law").

Clearly Article VIII(1) only applies to companies of one of the Treaty countries operating in the other country. Sumitomo contends that it is a company of Japan, and that Article VIII(1) of the Treaty grants it very broad discretion to fill its executive, managerial, and sales positions exclusively with male Japanese citizens.[7]

Article VIII(1) does not define any of its terms; the definitional section of the Treaty is contained in Article XXII. Article XXII(3) provides:

> "As used in the present Treaty, the term 'companies' means corporations, partnerships, companies and other associations, whether or not with limited liability and whether or not for pecuniary profit. Companies constituted under the applicable laws and regulations within the territories of either Party *shall be deemed companies thereof* and shall have their juridical status recognized within the territories of the other Party." (Emphasis added.)

Sumitomo is "constituted under the applicable laws and regulations" of New York; based on Article XXII(3), it is a company of the United States, not a company of Japan.[8] As

---

[7] The issues raised by this contention are clearly of widespread importance. As we noted in n. 6, *supra*, treaty provisions similar to that invoked by Sumitomo are in effect with many other countries. In fact, some treaties contain even more broad language. See, *e. g.*, Article XII(4), Treaty of Friendship, Commerce and Navigation with Greece, [1954] 5 U. S. T., at 1857–1859 ("Nationals and companies of either party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents *and other employees of their choice* . . .") (emphasis added). As of 1979, United States affiliates of foreign corporations employed over 1.6 million workers in this country. Howenstine, Selected Data on the Operations of U. S. Affiliates of Foreign Companies, 1978 and 1979, in Survey of Current Business 35, 36 (U. S. Dept. of Commerce, May 1981).

[8] The clear language of Article VII(1) and Article XXII(3) is consistent with other Treaty provisions. For example, Article XVI(2) accords national treatment to "[a]rticles produced by nationals and companies of ei-

a company of the United States operating in the United States, under the literal language of Article XXII(3) of the Treaty, Sumitomo cannot invoke the rights provided in Article VIII(1), which are available only to companies of Japan operating in the United States and to companies of the United States operating in Japan.

The Governments of Japan and the United States support this interpretation of the Treaty. Both the Ministry of Foreign Affairs of Japan and the United States Department of State agree that a United States corporation, even when wholly owned by a Japanese company, is not a company of Japan under the Treaty and is therefore not covered by Article VIII(1). The Ministry of Foreign Affairs stated its position to the American Embassy in Tokyo with reference to this case:

> "The Ministry of Foreign Affairs, as the Office of [the Government of Japan] responsible for the interpretation of the [Friendship, Commerce and Navigation] Treaty, reiterates its view concerning the application of Article 8, Paragraph 1 of the Treaty: For the purpose of the Treaty, companies constituted under the applicable laws . . . of either Party shall be deemed companies thereof and, therefore, a subsidiary of a Japanese company which is incorporated under the laws of New York is not

ther Party within the territories of the other Party, *or by companies of the latter Party controlled by such nationals and companies* . . . ." (Emphasis added.) This provision obviously envisions that companies of one party may be controlled by companies of the other party. If the nationality of a company were determined by the nationality of its controlling entity as Sumitomo proposes, rather than by the place of its incorporation, this provision would make no sense.

Several other Treaty provisions would make little sense if American subsidiaries were considered companies of Japan. Articles VII(1), VII(4), and XVI(2) contain clauses dealing with companies or enterprises controlled by companies of either party. If those companies or enterprises were themselves companies of the country of their parents, this separate treatment would be unwarranted.

covered by Article 8 Paragraph 1 when it operates in the United States."[9]

The United States Department of State also maintains that Article VIII(1) rights do not apply to locally incorporated subsidiaries.[10] Although not conclusive, the meaning attributed to treaty provisions by the Government agencies

---

[9] State Department Cable, Tokyo 03300, dated Feb. 26, 1982 (cable from the United States Embassy in Tokyo to the Secretary of State relaying the position of the Ministry of Foreign Affairs of Japan). See also Diplomatic Communication from the Embassy of Japan in Washington to the United States Department of State, dated Apr. 21, 1982 ("The Government of Japan reconfirms its view that a subsidiary of a Japanese company which is incorporated under the laws of New York is not itself covered by article 8., paragraph 1 of the Treaty of Friendship, Commerce and Navigation between Japan and the United States (the FCN Treaty) when it operates in the United States").

[10] Brief for United States as *Amicus Curiae* 8–22; Letter of James R. Atwood, Deputy Legal Adviser, U. S. Department of State, to Lutz Alexander Prager, Assistant General Counsel, Equal Employment Opportunity Commission, dated Sept. 11, 1979, reprinted in App. 307a. ("On further reflection on the scope of application of the first sentence of Paragraph 1 of Article VIII of the U. S.-Japan FCN, we have established to our satisfaction that it was not the intent of the negotiators to cover locally-incorporated subsidiaries, and that therefore U. S. subsidiaries of Japanese corporations cannot avail themselves of this provision of the treaty").

The Court of Appeals and Sumitomo dismiss the Atwood letter as incorrect, and point to a letter written by a previous State Department Deputy Legal Adviser as taking the contrary view. Letter of Lee R. Marks, Deputy Legal Adviser, U. S. Department of State, to Abner W. Sibal, General Counsel, Equal Employment Opportunity Commission, dated Oct. 17, 1978, reprinted in App. 94a. However neither of these letters is indicative of the state of mind of the Treaty negotiators; they are merely evidence of the later interpretation of the State Department as the agency of the United States charged with interpreting and enforcing the Treaty. However ambiguous the State Department position may have been previously, it is certainly beyond dispute that the Department now interprets the Treaty in conformity with its plain language, and is of the opinion that Sumitomo is not a company of Japan and is not covered by Article VIII(1). That interpretation, and the identical position of the Government of Japan, is entitled to great weight. *Kolovrat v. Oregon*, 366 U. S. 187 (1961).

charged with their negotiation and enforcement is entitled to great weight.  *Kolovrat* v. *Oregon*, 366 U. S. 187, 194 (1961).[11]

Our role is limited to giving effect to the intent of theTreaty parties.  When the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation.[12]

## III

Sumitomo maintains that although the literal language of the Treaty supports the contrary interpretation, the intent of Japan and the United States was to cover subsidiaries regardless of their place of incorporation.  We disagree.

Contrary to the view of the Court of Appeals and the claims of Sumitomo, adherence to the language of the Treaty would not "overlook the purpose of the Treaty."  638 F. 2d, at 556.  The Friendship, Commerce and Navigation Treaty between Japan and the United States is but one of a series of similar commercial agreements negotiated after World War II.[13]  The primary purpose of the corporation provisions of

---

[11] Determining the nationality of a company by its place of incorporation is consistent with prior treaty practice.  See Walker, 50 Am. J. Int'l L., *supra* n. 6, at 382–383.  The place-of-incorporation rule also has the advantage of making determination of nationality a simple matter.  On the other hand, application of a control test could certainly make nationality a subject of dispute.

[12] We express no view, of course, as to the interpretation of other Friendship, Commerce and Navigation Treaties which, although similarly worded, may have different negotiating histories.

[13] See, *e. g.*, Treaties of Friendship, Commerce and Navigation with China, 63 Stat. 1299, T. I. A. S. No. 1871 (1946); Italy, 63 Stat. 2255, T. I. A. S. No. 1965 (1948); Israel, [1954] 5 U. S. T. 550, T. I. A. S. No. 551 (1951); Greece, [1954] 5 U. S. T. 1829, T. I. A. S. No. 3057 (1951); Japan, [1953] 4 U. S. T. 2063, T. I. A. S. No. 2863 (1953); Federal Republic of Germany, [1956] 7 U. S. T. 1839, T. I. A. S. No. 3593 (1954); The Netherlands, [1957] 8 U. S. T. 2043, T. I. A. S. No. 3942 (1956); and Pakistan, [1961] 12 U. S. T. 110, T. I. A. S. No. 4683 (1959).  The provisions of several of the treaties are compared in tabular form in Commercial Trea-

the Treaties was to give corporations of each signatory legal status in the territory of the other party, and to allow them to conduct business in the other country on a comparable basis with domestic firms. Although the United States negotiated commercial treaties as early as 1778, and thereafter throughout the 19th century and early 20th century,[14] these early commercial treaties were primarily concerned with the trade and shipping rights of individuals. Until the 20th century, international commerce was much more an individual than a corporate affair.[15]

As corporate involvement in international trade expanded in this century, old commercial treaties became outmoded. Because "corporation[s] can have no legal existence out of the boundaries of the sovereignty by which [they are] created," *Bank of Augusta* v. *Earle*, 13 Pet. 519, 588 (1839), it became necessary to negotiate new treaties granting corporations legal status and the right to function abroad. A series of Treaties negotiated before World War II gave corporations legal status and access to foreign courts,[16] but it was not until the

---

ties: Hearing on Treaties of Friendship, Commerce and Navigation with Israel, Ethiopia, Italy, Denmark, Greece, Finland, Germany, and Japan, before the Subcommittee of the Senate Committee on Foreign Relations, 83d Cong., 1st Sess., 7–17 (1953).

[14] See, *e. g.*, Treaty of Amity and Commerce with France, 8 Stat. 12, T. S. No. 83 (1778); Treaty of Amity, Commerce and Navigation with Great Britain, 8 Stat. 116, T. S. No. 105 (1794); Treaty of Commerce and Friendship with Sweden and Norway, 8 Stat. 232, T. S. No. 347 (1816); Treaty of Commerce and Navigation with the Netherlands, 8 Stat. 524, T. S. No. 251 (1839); Treaty of Commerce and Navigation with Belgium, 8 Stat. 606, T. S. No. 19 (1845); Treaty of Commerce and Navigation with Italy, 17 Stat. 845, T. S. No. 177 (1871); Treaty of Commerce with Spain, 23 Stat. 750, T. S. No. 337 (1884); Treaty of Commerce with Germany, 31 Stat. 1935, T. S. No. 101 (1900); Treaty of Commerce with China, 33 Stat. 2208, T. S. No. 430 (1903).

[15] See Walker, 50 Am. J. Int'l L., *supra* n. 6, at 374–378.

[16] Treaty of Commerce and Navigation with Japan, 37 Stat. 1504, T. S. No. 558 (1911); Treaties of Friendship, Commerce and Consular Rights

postwar Friendship, Commerce and Navigation Treaties that United States corporations gained the right to conduct business in other countries.[17]   The purpose of the Treaties was

---

with Germany, 44 Stat. 2132, T. S. No. 725 (1923); Estonia, 44 Stat. 2379, T. S. No. 736 (1925); Hungary, 44 Stat. 2441, T. S. No. 748 (1925); El Salvador, 46 Stat. 2817, T. S. No. 827 (1926); Honduras, 45 Stat. 2618, T. S. No. 764 (1927); Latvia, 45 Stat. 2641, T. S. No. 765 (1928); Austria, 47 Stat. 1876, T. S. No. 838 (1928); Norway, 47 Stat. 2135, T. S. No. 852 (1928); Poland, 48 Stat. 1507, T. S. No. 862 (1931); Finland, 49 Stat. 2659, T. S. No. 868 (1934); Treaties of Friendship, Commerce and Navigation with Siam, 53 Stat. 1731, T. S. No. 940 (1937); Liberia, 54 Stat. 1739, T. S. No. 956 (1938).

These rights given to corporations by these Treaties were quite limited. For example, Article VII of the 1911 Treaty with Japan provided:

"Limited liability and other companies and associations . . . already or hereafter to be organized in accordance with the laws of either High Contracting Party and domiciled in the territories of such Party, are authorized, in the territories of the other, to exercise their rights and appear in the courts either as plaintiffs or defendants, subject to the laws of such other Party.

"The foregoing stipulation has no bearing upon the question whether a company or association organized in one of the two countries will or will not be permitted to transact its business or industry in the other, this permission remaining always subject to the laws and regulations enacted or established in the respective countries or in any part thereof."   37 Stat. 1506.

A similarly limited provision was contained in the other Treaties.

[17] The significance of this advance was emphasized in the Senate hearings on an early set of postwar Friendship, Commerce and Navigation Treaties:

"Perhaps the most striking advance of the postwar treaties is the cognizance taken of the widespread use of the corporate form of business organization in present-day economic affairs.   In the treaties antedating World War II American corporations were specifically assured only small protection against possible discriminatory treatment in foreign countries.   In the postwar treaties, however, corporations are accorded essentially the same treaty rights as individuals in such vital matters as the right to do business, taxation on a nondiscriminatory basis, the acquisition and enjoyment of real and personal property, and the application of exchange controls. Furthermore, the citizens and corporations of one country are given substantial rights in connection with forming local subsidiaries under the corporation laws of the other country and controlling and managing the affairs of such local companies."   Commercial Treaties: Hearing on Treaties of

not to give foreign corporations greater rights than domestic companies, but instead to assure them the right to conduct business on an equal basis without suffering discrimination based on their alienage.

The Treaties accomplished their purpose by granting foreign corporations "national treatment" [18] in most respects and by allowing foreign individuals and companies to form locally incorporated subsidiaries. These local subsidiaries are considered for purposes of the Treaty to be companies of the country in which they are incorporated; they are entitled to the rights, and subject to the responsibilities of other domestic corporations. By treating these subsidiaries as domestic companies, the purpose of the Treaty provisions—to assure that corporations of one Treaty party have the right to conduct business within the territory of the other party without suffering discrimination as an alien entity—is fully met.

---

Friendship, Commerce and Navigation Between the United States and Colombia, Israel, Ethiopia, Italy, Denmark and Greece before a Subcommittee of the Senate Committee on Foreign Relations, 82d Cong., 2d Sess., 4–5 (1952) (opening statement of Harold Linder, Deputy Assistant Secretary of State for Economic Affairs).

[18] "National treatment" is defined in Article XXII(1) of the Treaty:

"The term 'national treatment' means treatment accorded within the territories of a Party upon terms no less favorable than the treatment accorded therein, in like situations, to nationals, companies, products, vessels or other objects, as the case may be, of such Party."

In short, national treatment of corporations means equal treatment with domestic corporations. It is ordinarily the highest level of protection afforded by commercial treaties. In certain areas treaty parties are unwilling to grant full national treatment; in those areas the parties frequently grant "most-favored-nation treatment," which means treatment no less favorable than that accorded to nationals or companies of any third country. See Article XXII(2) of the Treaty. "The most-favored-nation rule can now, therefore, imply or allow the status of alien disability rather than of favor. In applicable situations nowadays, the first-class treatment tends to be national treatment; that which the citizens of the country enjoy." Walker, Modern Treaties of Friendship, Commerce and Navigation, 42 Minn. L. Rev. 805, 811 (1958).

Nor can we agree with the Court of Appeals view that literal interpretation of the Treaty would create a "crazy-quilt pattern" in which the rights of branches of Japanese companies operating directly in the United States would be greatly superior to the right of locally incorporated subsidiaries of Japanese companies. 638 F. 2d, at 556. The Court of Appeals maintained that if such subsidiaries were not considered companies of Japan under the Treaty, they, unlike branch offices of Japanese corporations, would be denied access to the legal system, would be left unprotected against unlawful entry and molestation, and would be unable to dispose of property, obtain patents, engage in importation and exportation, or make payments, remittances, and transfers of funds. *Ibid.* That this is not the case is obvious; the subsidiaries, as companies of the United States, would enjoy all of those rights and more. The only significant advantage branches may have over subsidiaries is that conferred by Article VIII(1).

## IV

We are persuaded, as both signatories agree, that under the literal language of Article XXII(3) of the Treaty, Sumitomo is a company of the United States; we discern no reason to depart from the plain meaning of the Treaty language. Accordingly, we hold that Sumitomo is not a company of Japan and is thus not covered by Article VIII(1) of the Treaty.[19] The judgment of the Court of Appeals is va-

---

[19] We express no view as to whether Japanese citizenship may be a bona fide occupational qualification for certain positions at Sumitomo or as to whether a business necessity defense may be available. There can be little doubt that some positions in a Japanese controlled company doing business in the United States call for great familiarity with not only the language of Japan, but also the culture, customs, and business practices of that country. However, the Court of Appeals found the evidentiary record insufficient to determine whether Japanese citizenship was a bona fide occupational qualification for any of Sumitomo's positions within the reach of Article VIII(1). Nor did it discuss the bona fide occupational

cated, and the case is remanded for further proceedings consistent with this opinion.

*Vacated and remanded.*

_____

qualification exception in relation to respondents' sex discrimination claim or the possibility of a business necessity defense. Whether Sumitomo can support its assertion of a bona fide occupational qualification or a business necessity defense is not before us. See n. 4, *supra.*

We also express no view as to whether Sumitomo may assert any Article VIII(1) rights of its parent.