**AIR CANADA, Petitioner,**

v.

**U.S. DEPARTMENT OF TRANSPORTATION, Respondent,**

**American Airlines, Inc., Eastern Air Lines, Inc., Intervenors.**

No. 87–1300.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 29, 1988.

Decided April 15, 1988.

Robert N. Kharasch for petitioner; Albert F. Grisard, Mark S. Kahan, Susan B. Jollie, and Andrew B. Sacks, Washington, D.C. were on the brief for petitioner.

Kenneth N. Weinstein, Deputy Asst. Gen. Counsel for Litigation, Dept. of Transp., with whom B. Wayne Vance, Gen. Counsel, Dept. of Transp., and John J. Powers, III, and Laura Heiser, Attys., Dept. of Justice, Washington, D.C. were on the brief, for respondent. Thomas L. Ray, Atty., Dept. of Transp., Washington, D.C., also entered an appearance for respondent.

Alfred V.J. Prather, J. William Doolittle, Carl B. Nelson, Jr., Ronald A. Stern, and

Robert N. Duggan, Washington, D.C., were on the brief for intervenors.

Before WALD, Chief Judge, and EDWARDS and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Air Canada petitions for review of the United States Department of Transportation's denial of its request for a permanent increase in takeoff and landing rights, or "slots," at New York's LaGuardia Airport. Air Canada argues that the agency erroneously interpreted the Memorandum of Understanding between the United States and Canada that governs the allocation of slots at LaGuardia. We conclude that the Department of Transportation correctly interpreted the Memorandum and affirm.

## I. BACKGROUND

This is the latest chapter in a long-running controversy between Canada and the United States over landing rights at LaGuardia Airport ("LGA"). The dispute began when the Federal Aviation Administration ("FAA"), a division of the Department of Transportation ("DOT" or "Department"), promulgated the High Density Rule, strictly regulating air traffic at certain airports. 14 C.F.R. pt. 93 subpt. K (1987). In 1984, Air Canada, a corporation wholly owned by the Canadian Government, sought to increase its flights between LGA and Canada. When the FAA advised Air Canada that the planned increase would violate the High Density Rule, the carrier challenged its application. A panel of this court held that Air Canada's petition for review was untimely. *Air Canada v. FAA*, No. 84–1521 (D.C.Cir. 1985) (mem. op.). Pending a petition for rehearing, the case was dismissed from our docket pursuant to stipulation. Under that stipulation, Air Canada acknowledged the applicability of the High Density Rule, and was granted twenty-eight slots at LGA, four more than it had been using.

At the same time as the settlement between Air Canada and the FAA, the Governments of Canada and the United States entered into a Memorandum of Understanding ("MOU"). Joint Appendix ("J.A.") at 31–32. This case concerns the proper interpretation of two provisions of the MOU:

While the High Density Rule is in effect, no U.S. carrier may increase its non-stop operations between LaGuardia and Canada so that the total number of such operations by U.S. carriers is greater than the number scheduled on December 31, 1984, unless Canadian airlines have the opportunity to establish a comparable increase in LaGuardia–Canada operations over the number scheduled by Air Canada on that date.

... In no case shall an airline of one country be required to reduce operations should an airline of the other country voluntarily reduce operations.

The FAA subsequently promulgated 14 C.F.R. § 93.217(a)(7) (1987), which provides:

If required by bilateral agreement, additional slots shall be allocated at LaGuardia Airport for international scheduled passenger operations within the hour requested.

The FAA may allocate such additional slots by withdrawing them from domestic service. 14 C.F.R. § 93.223(a) (1987). The agency withdraws slots according to a reverse or recall lottery procedure. *See id.* at § 93.223(b) and (c).

In December 1985, American Airlines ("AA" or "American") increased its flights from LGA to Canada by diverting two slots it had used previously for domestic service. No regulation prohibits a carrier from converting slots from domestic to foreign use, but the airline must notify the FAA under 14 C.F.R. § 93.217(d) (1987). American gave such notice, and although it did not require approval for the rededication of slots, FAA officials gave AA "informal clearance." J.A. at 146.

There is some dispute as to when the relevant United States authorities were first notified of the Canadian position that, as a consequence of AA's diversion, Cana-

dian carriers were automatically entitled to two additional slots for service between LGA and Canada. Air Canada points to a letter to the FAA dated August 18, 1986, in which the carrier requested allocation of additional permanent slots because of American Airlines' increased Canadian service. J.A. at 33. The DOT discounts this letter because the FAA and Air Canada agreed to ignore the request for additional slots made in the August letter, J.A. at 37, and because Air Canada notified the FAA, not the Office of the Secretary of Transportation ("OST") of the DOT, the unit directly responsible for negotiating, construing, and enforcing bilateral aviation agreements such as the MOU. Brief for Respondent at 18. The appropriate DOT authorities certainly knew of Air Canada's view by December 3, 1986, when Air Canada reapplied for two additional LGA slots on the ground that AA's actions constituted an increase in LGA–Canada operations under the MOU. J.A. at 126.

Following extended discussions between the FAA and American, the FAA requested that American either discontinue one round-trip between LGA and Canada per day or provide Air Canada with two slots at LGA. Under protest, American stopped its additional Canadian flights.

Having brought about this result, FAA staff took the position that the United States had satisfied its obligations under the MOU and refused to grant Air Canada's request for two additional permanent slots. Because Air Canada had already prepared to increase service, however, the FAA did grant the slots to Air Canada on a temporary basis from April 27 to June 14. The temporary allocation was later extended to July 26 to permit Air Canada's orderly termination of service. Those slots were granted on the express understanding that they did not establish any right to permanent slots under the MOU. J.A. at 151.

Air Canada petitioned the Secretary of Transportation for review of the staff's decision. This petition was denied by Order No. 87–6–58, the ruling under review in this case. J.A. at 114–25. The DOT concluded that under the plain language of the

MOU, the unilateral increase in service by American did not entitle Air Canada to a permanent award of additional slots. Rather, the MOU restricts U.S. carriers from increasing service unless they have ascertained that Canadian carriers are assured similar access to additional slots. The DOT also rejected the argument that section 93.217(a)(7) of the High Density Rule, *supra* at 1485, required the agency to allocate additional slots. The regulation requires such allocation, the DOT believed, only if otherwise required by the MOU. As the MOU did not entitle Air Canada to an increased permanent slot allocation, neither did the regulation.

Following another dispute, not now before us, concerning the interpretation of the MOU, the United States notified Canada of its intention to terminate the agreement, effective March 22, 1989. Diplomatic Note from U.S. Department of State to Canadian Embassy (Mar. 22, 1988). The U.S. also requested consultations on service at LGA, to begin no later than May 21, 1988. *Id.* This recent development does not affect our decision.

## II. DISCUSSION

### A. Standard of Review

█ The agency's action may not be set aside unless it is arbitrary and capricious. 49 U.S.C.App. § 1486 (1982); 5 U.S.C. § 706(2)(A) (1982). The MOU is an international executive agreement, which we interpret according to the principles applicable to treaties. *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982), stated the general rule:

> The clear import of treaty language controls unless "application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." *Maximov v. United States,* 373 U.S. 49, 54, 83 S.Ct. 1054, 1057, 10 L.Ed.2d 184 (1963).

When the operative terms have some play, however, the reviewing court owes substantial deference to the interpretation giv-

en by the administering agency to matters within its competence:

> Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight. *Kolovrat v. Oregon*, 366 U.S. 187, 194 [81 S.Ct. 922, 926, 6 L.Ed.2d 218] (1961).

*Sumitomo*, 457 U.S. at 184–85, 102 S.Ct. at 2379. We applied this standard to the interpretation by the Civil Aeronautics Board of various bilateral aviation agreements:

> Our review of this question is informed by the acknowledged need to defer to the expertise of the Board—the agency responsible in part for negotiating the very executive agreements whose interpretation is now in dispute. *See Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–85 [102 S.Ct. 2374, 2379, 72 L.Ed.2d 765] (1982); *Collins v. Weinberger*, 707 F.2d 1518, 1522 (D.C.Cir. 1983).

*Japan Air Lines Co. v. Dole*, 801 F.2d 483, 488 (D.C.Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1372, 94 L.Ed.2d 688 (1987). In *Collins*, which involved a regulation implementing multilateral agreements, we stated:

> Interpretation, clarification and implementation are always necessary, and it is the executive branch, in agreement with the other party to the treaty, which bears primary responsibility for these functions. Courts should defer to such executive actions provided they are not inconsistent with or outside the scope of the treaty.

707 F.2d at 1522. We give somewhat less deference here than in *Sumitomo* and *Japan Air Lines* because the Government of Canada disagrees with the DOT's interpretation of the MOU. *See* Reply Brief at 16–17. Still, the Department has wide latitude in interpreting the MOU, and we will defer to its reasonable interpretation.

We reject the DOT's suggestion that "there is at least some question as to whether this [c]ourt should be entertaining Air Canada's challenge at all." Brief for Respondent at 13. As the MOU contemplates diplomatic consultation to resolve disputes between Canada and the United States, the DOT claims that such consultation is the exclusive method of dispute resolution. The DOT fails to note, however, that the MOU expressly states that the availability of diplomatic consultation "in no way limits the right of airlines to pursue appropriate remedies in the courts...." J.A. at 31. Nor can it be argued convincingly that the case raises nonjusticiable political questions. Brief for Respondent at 14 n. 17. We rejected just such a claim in *British Caledonian Airways, Ltd. v. Bond*, 665 F.2d 1153, 1162 (D.C.Cir.1981). We previously have adjudicated disputes arising under similar international executive aviation agreements. *See, e.g., Japan Air Lines*, 801 F.2d 483.

### B. Merits

#### 1. *Reciprocity provision*

This dispute was caused, or at least exacerbated, by a series of blunders. First, American notified the FAA of its decision to shift slots from domestic to foreign use, but the agency required AA to terminate the foreign flights only after Air Canada complained. This represents a failure of coordination between the FAA and the OST, the division of the DOT charged with enforcing bilateral aviation agreements. Had the FAA notified the OST of the proposed shift, the DOT could have averted the whole embroglio by preventing American from increasing its Canadian flights.

Second, Air Canada waited approximately eight months after AA initiated its increased Canadian service before it first asserted a right to increased slots. Although Air Canada might not have wished to increase its LaGuardia service immediately, its delay in asserting its claim contributed to whatever injuries it may have suffered as a result of the failure of the DOT to address the matter in a more timely fashion.

On the other hand, we disagree with the DOT's claim that Air Canada's August application to the FAA was ineffective because Air Canada failed to notify the OST of its position. The FAA is the agency

with which foreign airlines normally deal, and we know of no statute or regulation requiring Air Canada to notify the OST of its plans in this instance. Air Canada's application to the FAA, the division charged with administering the High Density Rule that limited access to LaGuardia, was reasonable under these circumstances. The FAA and the OST are both components of the DOT, and the failure of intrabranch communications can hardly be blamed on Air Canada.

■ Despite this bureaucratic lapse, we uphold the DOT's interpretation and application of the MOU. As noted *supra* at 1485, the MOU provides:

> no U.S. carrier may increase its non-stop operations between LaGuardia and Canada ... unless Canadian airlines have the opportunity to establish a comparable increase in LaGuardia–Canada operations....

Air Canada interprets this provision as requiring the United States to provide it with additional LGA slots whenever a U.S. carrier unilaterally increases its LGA–Canada operations. As the condition precedent, increased flights by a U.S. airline, has obtained, Air Canada's right to LGA slots has vested. Brief for Petitioner at 18.

Air Canada assumes the MOU leaves U.S. airlines absolutely free to increase Canadian service. Not so. The MOU plainly blocks a "U.S. carrier" from increasing its "operations between LaGuardia and Canada" unless it has ascertained that "Canadian airlines have the opportunity to establish a comparable increase." The DOT can respond to an increase in LGA–Canada flights by a U.S. airline by awarding a Canadian carrier additional slots through its reverse lottery procedure. *See supra* at 1485–1486; 14 C.F.R. § 93.223 (1987). If the DOT chooses not to, and if a Canadian carrier is not assured the requisite slots by other means, the MOU requires the DOT to prevent the U.S. carrier from increasing Canadian flights. If it has failed to prevent the initiation of increased service, the agency must halt the increase as soon as practicable.

In this case, the DOT did not approve AA's increase. True, FAA officials informally cleared American's increase, and the DOT constructively knew of AA's plans. *See supra* at 1487–88.... The DOT should have enforced the MOU, but it cannot be said to have "approved" the increase by this error. Once the DOT was informed by Air Canada of American's increase, it properly remedied the violation of the MOU by requiring AA to desist. Air Canada has no right to slots under the MOU because the DOT never endorsed American Airlines' expanded service.

■ Air Canada denies that the MOU restrains U.S. carriers. It argues that any U.S. airline has the absolute right to rededicate slots from domestic to international use without the FAA's permission. The carrier's only obligation is to notify the FAA of the rededication. Therefore, American Airlines was perfectly free to shift two of its domestic slots to Canadian service, and the agency was impotent to block the move. Brief for Petitioner at 5–6 & n. 3. Air Canada also asserts that even if permission were required, FAA officials informally cleared American's increased LGA–Canada service. *Id.* at 14 (citing letter from AA to FAA, J.A. at 146).

The DOT concedes that the High Density Rule "does not prohibit U.S. carriers from using their domestic slots for international operations," Brief for Respondent at 21, but argues that the Department retains the authority to order airlines to cease certain operations. This authority derives from its control of the airlines' certificates of public convenience and necessity (operating certificates), which require compliance with applicable international agreements. *Id.* at 22. The DOT should have utilized this authority earlier, rather than allow American to increase its operations in violation of the MOU for almost a year and a half. Despite this error, we agree that the DOT had the authority to order the rollback.

Language aside, the DOT's interpretation of the MOU more probably corresponds to the negotiators' intent because it is more sensible and practical than Air Canada's. Under Air Canada's view, a Canadi-

an airline would acquire a *permanent* right to additional slots whenever a U.S. carrier unilaterally decided to increase its service to Canada. The DOT could not regulate these decisions because, according to Air Canada, U.S. carriers have the unfettered right to transfer slots from domestic to foreign use. Finally, a U.S. carrier that increased its Canadian operations would not necessarily lose slots as the reverse lottery (which Air Canada argues must be used) might remove slots from one of the triggering carrier's competitors. The DOT's interpretation avoids this bizarre incentive scheme and the resulting irreversible ratchet of increased LGA–Canada flights allocated to Canadian airlines. The MOU negotiators may be presumed to have intended a more rational application of their agreement.

### 2. *"Reduce operations" clause*

The MOU further provides:

In no case shall an airline of one country be required to reduce operations should an airline of the other country voluntarily reduce operations.

J.A. at 32.

■ Air Canada argues that the Department's order violates the MOU because it requires the carrier to reduce the operations it was able to conduct by virtue of the FAA's temporary allocation of slots. This reduction, says Air Canada, was required because American Airlines "voluntarily" reduced its Canadian flights. We agree, however, with the DOT's position that this provision refers to operations authorized by an allocation of slots under the MOU. For example, if U.S. carriers, for purely business reasons, decreased their Canadian flights below the level prevailing at the time the MOU was executed, the United States could not require Canadian carriers to give up a comparable number of slots under a general "parity" principle. We do not deal with such a case; Air Canada was not required to reduce operations below the level authorized by the MOU. *See Order,* J.A. at 123. The temporary allocation expired by its terms and was granted on the express understanding that it did not establish any rights under the MOU. J.A. at 151. Finally, American's reduction of LGA–Canada operations was not voluntary, but effectively required by the FAA.

### 3. *FAA regulation*

■ Air Canada points to an FAA regulation that it claims entitles it to slots: *If required by bilateral agreement,* additional slots shall be allocated at LaGuardia Airport for international scheduled passenger operations within the hour requested.

14 C.F.R. § 93.217(a)(7) (1987) (emphasis added). The regulation is irrelevant to this case, for it only entitles Air Canada to increased slots if the MOU (or another bilateral agreement) so requires. Air Canada is correct in arguing that this regulation precludes a denial of slots on the basis of their unavailability. Brief for Petitioner at 20–21; Reply Brief at 3–4 & n. 3. The DOT, however, based its order not on the unavailability of slots sought by Air Canada, but on the illegality of AA's diversion of two of its domestic slots to foreign service. The DOT merely stated that whereas American reallocated slots from domestic to foreign use, "there were no slots available to Air Canada to initiate a comparable increase." J.A. at 122. It did not state that Air Canada's application for increased slots was being denied because they were unavailable, and the DOT now expressly disclaims this rationale, relying solely on its interpretation of the MOU.

### III. CONCLUSION

The DOT reasonably interpreted the MOU as restraining U.S. airlines from increasing LGA–Canada operations, and not as automatically entitling Air Canada to slots whenever a U.S. carrier unilaterally and unlawfully increases its operations. Despite the FAA's failure to prevent American Airlines' initiation of increased Canadian service, the DOT eventually corrected the situation. The Department's order is

*Affirmed.*