MURPHY, Circuit Judge,
dissenting.
The majority affirms a preliminary injunction prohibiting the United States[1] from enforcing the Controlled Substances Act (“CSA”), 21 U.S.C. § 801 et seq., thereby placing the United States in violation of the United Nations Convention on Psychotropic Substances, Feb. 21, 1971 (the “Convention”), 32 U.S.T. 543. Because the majority utilizes the wrong standard in determining whether 0 Centro Espirita Beneficíente Uniao do Vegetal (“UDV”) has made the necessary showing for obtaining a preliminary injunction, and because UDV has not shown that the preliminary injunction factors weigh heavily and compellingly in its favor, I respectfully dissent.
I. Improper Standard for Preliminary Injunction
The United States asserts that the district court abused its discretion in granting UDV a preliminary injunction because it utilized an improper standard. See SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098 (10th Cir.1991) (“We will set aside a preliminary injunction if the district court applied the wrong standard when deciding to grant the preliminary injunction motion.”). In particular, the United States asserts that because the preliminary in *1188 junction requested by UDV alters the status quo, the district court should have required UDV to “show that on balance, the four [preliminary injunction] factors weigh heavily and compellingly in [its] favor.” Id. at 1099. The majority’s response to this argument is two-fold: (1) “the last uncontested status between the parties was the plaintiffs’ uninhibited exercise of their faith,” Majority Op. at 1178 (alteration in original); and (2) UDV’s establishment of a prima facie case under the Religious Freedom Restoration Act “buttresses the conclusions that the status quo here is not the need to enforce the CSA but rather UDV’s religious practice free from a governmentally imposed burden,” id. at 1179. Neither of the reasons posited by the majority for concluding that the status quo favors UDV’s use of hoasca is convincing.
The majority’s conclusion that the status quo in this case is contingent on the merits of UDV’s RFRA claim is clearly at odds with binding Tenth Circuit precedent. In SCFC ILC, the proponent of a preliminary injunction argued that the preliminary injunction entered by the district court preserved the status quo because it was entitled to the relief afforded in the preliminary injunction under various federal and state laws. 936 F.2d at 1099. This court explicitly rejected the contention that- the status quo is measured by the parties’ legal rights, holding as follows:
MountainWest confuses “what should be” with “what is.” While [Plaintiff] may eventually succeed in convincing the district court, on the merits, to order Visa to issue the cards to it, a final decision so holding would unquestionably alter the status quo. The status quo is not defined by the parties existing legal rights; it is defined by the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties’ legal rights.
Id. at 1100 (footnote omitted).
Despite the clear and unambiguous language in SCFC ILC defining the status quo by reference to the reality of the parties’ existing status and relationship, as opposed to the parties’ legal rights, the majority concludes that the status quo in this case should be measured with reference to the parties’ litigation positions, i.e., whether UDV established the existence of a prima facie case under RFRA. See Majority Op. at 1178-79. The majority, like the proponent of the preliminary injunction in SCFC ILC, has “confuse[d] ‘what should be’ with ‘what is.’ ” 936 F.2d at 1100. In so doing, the majority has carved out the following special rule in RFRA cases: the status quo ante is irrelevant when the proponent of an injunction has submitted evidence establishing a prima facie case under RFRA. This special rule, however, is at odds with SCFC ILC. See In re Smith, 10 F.3d 723, 724 (10th Cir.1993) (per curiam) (“We cannot overrule the judgment of another panel of this court. We are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court.”).
Nor is the majority correct in asserting that the status quo in this case is UDV’s use of hoasca because it was the government’s enforcement of the CSA that was the impetus for the present litigation. Majority Op. at 1178. As noted by the panel that stayed the district court’s preliminary injunction pending appeal, the status quo in this case is the enforcement of the CSA and compliance with the Convention. See O Centro Espirita Beneficiente Uniao De Vegetal (USA), Inc. v. Ashcroft, 314 F.3d 463, 466 (10th Cir.2002). The record makes clear that both the UDV itself and the United States recognized *1189 that the importation and consumption of hoasca violated the CSA.
The UDV has made a concerted effort to keep secret their importation and use of hoasca. On the relevant import forms, UDV officials in the United States generally referred to hoasca as an “herbal tea”; they never called it hoasca or ayahuasca or disclosed that it contained DMT. UDV president Jeffrey Bronfman informed customs brokers that the substance being imported was an “herbal extract” to be used by UDV members as a “health supplement.” Furthermore, in an e-mail drafted by Bronfman, he emphasized the need for confidentiality regarding UDV’s “sessions” involving hoasca: “Some people do not yet realize what confidentiality is and how careful we need to be. People should not be talking publicly anywhere about our sessions, where we have them and who attends them.” Finally, when UDV attempted to grow psychotria viridis and banisteriopsis caapi in the United States, it imported the seeds and plants “clandestinely,” in the words used by UDV, and required its members to sign confidentiality agreements to keep their attempts secret. All of these actions by plaintiff UDV demonstrate a recognition that its importation and consumption of hoasca violated the CSA. Likewise, when the United States realized that UDV was importing a preparation which contained DMT, it seized that shipment and additional quantities of the preparation found in a search of Bronfman’s residence. Accordingly, although UDV eventually sought a preliminary injunction after the seizure of the hoasca, at all times leading up to that event the record reveals that the status quo was the enforcement of the CSA.[2]
*1190 Because the district court did not recognize that the preliminary injunction requested by UDV would alter the status quo, it failed to require UDV to carry the onerous burden of demonstrating that the four preliminary injunction factors weigh heavily and compellingly in its favor. Accordingly, the district court abused its discretion in issuing the preliminary injunction. SCFC ILC, 936 F.2d at 1100. That conclusion, however, does not compel a remand to the district court. Because the record in this case is sufficiently well developed, it is appropriate for this court to determine whether UDV has satisfied its burden of demonstrating that the preliminary injunction factors weigh heavily and compellingly in its favor. Id.
II. Balance of Injury and Public Interest
I have serious reservations concerning the district court’s and majority’s conclusion that the United States did not carry its burden of demonstrating that the prohibition against importing or consuming hoasca furthers its compelling interests in protecting the health of UDV members and preventing diversion of hoasca to nonreligious uses. It is unnecessary to reach those questions, however, because UDV did not carry its burden of demonstrating that the third and fourth preliminary injunction factors — that the threatened injury to it outweighs the injury to the United States under the preliminary injunction and that the injunction is not adverse to the public interest — weigh heavily and compellingly in its favor.
As noted by this court in staying the preliminary injunction pending appeal, the United States suffers irreparable injury when it is enjoined from enforcing its criminal laws. O Centro Espirita, 314 F.3d at 467 (citing New Motor Vehicle Bd. v. Orrin W. Fox Co., 434 U.S. 1345, 1351, 98 S.Ct. 359, 54 L.Ed.2d 439 (1977) (Rehnquist, Circuit Justice)). This injury to the United States is exacerbated by the fact that any preliminary injunction issued by the district court, as illustrated by the numerous conditions and obligations imposed on the United States by the preliminary injunction actually issued by the district court, would require burdensome and constant official supervision and oversight of UDV’s handling and use of hoasca.[3] Id. (collecting cases and examples). UDV has not carried its burden of demonstrating that the balancing of its injury with that of the government weighs heavily and compellingly in its favor.
Furthermore, Congress has specifically found that the importation and consumption of controlled substances is adverse to the public interest. 21 U.S.C. § 801(2) *1191 (“The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.”); id. § 801a(l) (“The Congress has long recognized the danger involved in the manufacture, distribution, and use of certain psychotropic substances ..., and has provided strong and effective legislation to control illicit trafficking and to regulate legitimate uses of psychotropic substances in this country.”). In fact, the district court specifically found that the evidence was in equipoise as to the risk of diversion of hoasca to non-religious purposes and the danger of health complications flowing from hoasca consumption by UDV members. Although this led the district court to conclude that the United States had not carried its burden of demonstrating that the restrictions in the CSA against the importation and consumption of hoasca furthered the United States’ compelling interests and that, concomitantly, UDV was substantially likely to prevail on the merits of its Religious Freedom Restoration Act claim, the United States has no such burden at the third and fourth steps of the preliminary injunction analysis. At this stage, it is UDV that must demonstrate heavily and compellingly that the requested preliminary injunction is not adverse to the public interest. In light of the congressional findings noted above and the equipoised nature of the parties’ evidentia-ry submissions, UDV has not met its burden.
III. Violation of the Convention
Finally, the United States argues convincingly that a preliminary injunction requiring it to violate the Convention could seriously impede its ability to gain the cooperation of other nations in controlling the international-flow of illegal drugs. See 21 U.S.C. § 801a(l) (“Abuse of psychotropic substances has become a phenomenon common to many countries ... and is not confined to national borders. It is, therefore, essential that the United States cooperate with other nations in establishing effective controls over international traffic in such substances.”); see also O Centro Espirita, 314 F.3d at 467 (noting that federal courts should be reluctant to second guess the executive regarding the conduct of international affairs).
The majority fails to consider this factor in determining whether UDV has carried its burden of establishing its éntitlement to a preliminary injunction because, according to the majority, even assuming the Convention does cover hoasca, the government failed to demonstrate that such an interest must “be narrowly tailored to the specific plaintiff whose religious conduct is impaired.” Majority Op. at 1184. What the. majority apparently fails to realize, however, is that the meaning of the Convention is relevant not only with regard to the first preliminary injunction factor, likelihood of success on the merits, but also with regard to the third and fourth preliminary injunction factors, the balancing of harms and the adversity of the injunction to the public interest.[4]
*1192 The district court concluded that the Convention distinguishes between a “substance” in which the psychoactive component is derived but not “separated” from the plant source, versus a “substance,” which is a purified form of the psychoactive drug. Because, according to the district court, plants like psychotria viridis are not covered by the Convention, neither are “infusions and beverages” made from such plants, even if the infusion or beverage contains a Schedule I psychotropic chemical. In reaching this conclusion, the district court relied almost exclusively on the 1976 United Nations Commentary on the Convention on Psychotropic Substances (the “Commentary”). The district court’s interpretation of the Convention and its rebanee on the Commentary is fundamentaby flawed.
The Convention defines a “preparation” as “any solution or mixture, in whatever physical state, containing one or more psychotropic substances, or [ ] one or more psychotropic substances in dosage form.” Convention, 32 U.S.T. 543, Art. 1(f) (emphasis added). Hoasca clearly fits within the plain language of this definition. It is a solution or mixture, in a liquid state, containing the psychotropic substance DMT. The Convention further provides that “a preparation is subject to the same measures of control as the psychotropic substance which it contains.” Id. Art. 3(1).
Accordingly, hoasca is subject to the same controls applicable to DMT in a pure, separated form.
The district court appears to be have been led astray by UDV’s focus on Article 32 of the Convention and its assertion that Article 32 supports the proposition that plants may receive different treatment than the chemical components contained within the plants. Whether plants are covered by the Convention, however, is irrelevant. UDV does not seek to import and use plants that contain DMT; rather, it seeks to import, possess, and consume a preparation made from such a plant that can have no use other than to produce a drug-induced state, albeit in a sacramental context. In any event, UDV is simply incorrect in asserting that Article 32 supports its assertion that hoasca is not a preparation covered by the Convention because it is derived from a plant. Article 32 provides as fobows:
A State on whose territory there are plants growing wild which contain psychotropic substances from among those in Schedule I and which are traditionally used by certain smab, clearly determined groups in magical or religious rites, may, at the time of signature, ratification or accession, make reservations concerning these plants, in respect of the provisions of article 7, except for the provisions relating to international trade. [5]
*1193 import and export of those substances. Convention, Art. 7, 32 U.S.T. 543. It bears emphasizing, however, that Article 32, which allows signatory nations to make a reservation with regard to the use of certain plants like psychotria viridis in religious rites, does not allow signatories to opt out of the requirement that they prohibit the import or export of those plants. Id. Art. 32(4).
Convention, 32 U.S.T. 543, Art. 32(4). Article 32 actually suggests that plants are covered by the Convention, inasmuch as the Convention requires signatories to make reservations in order to allow their use. Article 32 also makes clear that even if a signatory makes a reservation, international trafficking in such plants is still prohibited by the Convention.[6]
The plain language of Article 7, coupled with the conforming interpretation of the Convention by the State Department, demonstrates that hoasca is a preparation covered by the Convention.[7] The congressional findings in 21 U.S.C. § 801a(l) make clear that international cooperation and compliance with the Convention is essential in providing effective control over the cross-border flow of such substances. UDV has not carried its burden of demonstrating heavily and compellingly that its interest in the use of sacramental hoasca pending the resolution of the merits of its complaint outweighs the harm resulting to the United States from a court order mandating that it violate the Convention. Nor has it shown heavily and compellingly that such an injunction is not adverse to the public interest.
*1194 IV. Conclusion
For those reasons set out above, I would reverse the district court’s entry of a preliminary injunction in favor of UDV. Accordingly, I respectfully dissent.

. Each of the defendant-appellants in this case is an officer of the United States sued in his official capacity.

. UDV baldly asserts in its brief on appeal that "[t]he 'status quo' before this litigation was that the plaintiffs possessed their sacrament and practiced their religion. Defendants' conduct changed the status quo, and did not create the status quo.” UDV Brief at 53-54. Under this theory, any party could establish the status quo by surreptitiously engaging in behavior that violated a statute until discovered by law enforcement authorities and then claiming that it is the enforcement of existing law that amounts to a change in the status quo. UDV’s assertion might have some persuasive force if it had openly imported and consumed hoasca and the United States had acquiesced in those actions for a period of time before changing course and enforcing the CSA. Under the facts of this case, however, UDV’s assertion is meritless. Unfortunately, the majority signs off on UDV's argument and makes it the law of this circuit. See Majority Op. at 1178. I simply fail to see how UDV’s importation and use of hoasca can be called “uncontested” when the government was not aware of the importation and consumption as a direct result of UDV's efforts to keep the matter secret.
For this reason, the majority can take no comfort in Valdez v. Applegate, 616 F.2d 570, 573 (10th Cir.1980) or Dominion Video Satellite v. EchoStar Satellite Corp., 269 F.3d 1149, 1153 (10th Cir.2001). See Majority Op. at 1177-78. In Valdez, the plaintiffs had been grazing their cattle in the Rio Puerco Grazing District, a 500,000 acre plot of land encompassing federal, state, and private lands. 616 F.2d at 571. The federal government adopted a revised grazing program which reduced the plaintiffs’ ability to graze their livestock. Id. The plaintiffs promptly sought a preliminary injunction claiming that the revised grazing program was contrary to federal law in several respects. Id. On these facts,, it is certainly not surprising this court determined that the status quo was the grazing program in effect prior to the government's proposed revisions. The same is true in Dominion Video. In that case, that parties had an ongoing business relationship, wherein EchoStar had been activating Dominion customers to receive Sky Angel satellite programming over a four-year period, despite a serious question whether EchoStar was contractually obligated to do so. 269 F.3d at 1155. When EchoStar declined to activate any further Dominion customers, Dominion immediately brought suit. Id. This court rejected EchoStar’s contention that the four-day period in which it declined to activate further Dominion customers represented the status quo, holding as follows: "Adopting EchoStar’s position would imply that any party could create a new status quo immediately preceding the litigation merely hy *1190 changing its conduct toward the adverse party." Id. (emphasis added).
As noted at length above, it cannot legitimately be argued that the government “changed its conduct” toward UDV. Both the government and UDV have consistently understood that the importation and consumption of DMT violates both the Convention and the CSA. The United States did not take any previous enforcement action against UDV only because UDV was successful at hiding its illegal conduct. As soon as the government became aware of UDV’s illegal activities, it seized the hoasca and enforced the CSA. This situation is entirely unlike the situations in Valdez and Dominion Video.

. Even a cursory review of the district court’s eleven page, thirty-six paragraph preliminary injunction belies the majority’s assertion that it preserves, rather than alters, the status quo. As noted at length above, prior to the district court’s entry of the preliminary injunction, UDV was surreptitiously importing hoasca with the clear knowledge that it was violating the CSA in the process. The district court's preliminary injunction modifies or enjoins enforcement of a staggering number of regulations implementing the CSA, with the result being that the United States must actually set about to aid UDV in the importation of an unlimited supply of hoasca.

. Although it is not quite clear, the majority's opinion could be read to state the proposition that the government's interest in complying with its obligations under the Convention are not compelling because those obligations conflict with the government's obligations under RFRA. Majority Op. at 1183-84. The majority further seems to assert that because RFRA was enacted after the Convention was ratified, the Convention is thereby nullified to the extent it conflicts with RFRA. Id. The majority is simply wrong in asserting that there is any kind of inherent conflict between RFRA and the Convention. Although RFRA prohibits the government from burdening a person's exercise of religion unless the burden furthers a compelling governmental interest, it does not attempt to define which interests are compelling. 42 U.S.C. § 2000bb-l (providing that the government may not substantially burden a person's exercise of religion unless *1192 the application of the burden to that person both furthers a compelling governmental interest and does so in the least restrictive manner). What RFRA does do is set out a deci-sional framework within which a court is to apply the law as it existed prior to the Supreme Court's decision in Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 155, 108 L.Ed.2d 876 (1990). Under this decisional framework, it is certainly possible that the government can advance a compelling interest in support of any action that burdens a person’s exercise of religion, but that the governmental action will still need to be enjoined because it will not be the least restrictive means of advancing the compelling interest. In those circumstances, it cannot be said that the governmental interest is not compelling. The question of whether a governmental interest is compelling is wholly independent of the question whether the burden flowing from the advancement of that interest fits within the contours of RFRA. In apparently concluding that the government’s interest in complying with the Convention is not compelling because it is “in conflict” with RFRA, the majority has compounded its error.

. Article 7 of the convention obligates signatory nations to prohibit all uses of Schedule I substances, with certain very limited exceptions not relevant here, and to prohibit the

. Because the definition of “preparation'' is clear and unambiguous, this court is obligated to give it its ordinary meaning absent “extraordinarily strong contrary evidence.” Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 185, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982). Nevertheless, the district court ignored that clear and unambiguous language in favor of language in the Commentary appearing to indicate that beverages and infusions made from plants containing hallucinogenic substances do not fall within the Convention. The Commentary notes that "[n]either ... the roots of the plant Mimosa hostilis nor Psilocybe mushrooms themselves are included in Schedule I, but only their respective active principles.” Commentary at 387. In two footnotes, the Commentary observes generally that “[a]n infusion of roots is used” to consume Mimosa hostilis and that "[b]everages ... are used” to consume Psilo-cybe mushrooms. Id. at 387 nn. 1227-28.
The Commentary does not constitute extraordinarily strong contrary evidence. It was drafted by a single author, published five years after the Convention was negotiated, and is, at most, ambiguous on the question whether a preparation like hoasca, as opposed to the plant psychotria viridis, is covered by the Convention. Because the Commentary was not written by the negotiators or signatories to the Convention, it is not the sort of “negotiating and drafting history” or "pos-tratification understanding of the contracting parties” that courts have traditionally used as evidence of the signatories' intent. See Zicherman v. Korean Air Lines Co., 516 U.S. 217, 226, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996). On the other hand, the interpretation of an international treaty by the United States agency charged with its negotiation and enforcement is entitled to "great weight” from the courts. Kolovrat v. Oregon, 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961). The State Department has interpreted the Convention to cover preparations such as hoasca. The State Department's interpretation is consistent with the plain language of the Convention and this court is obliged to accord it deference.

. For these reasons, the district court erred in concluding that compliance with the Convention does not constitute a compelling interest. Nevertheless, because this case can be resolved based solely on UDV's failure to carry its burden under the third and fourth preliminary injunction factors, I see no need to remand the case to the district court to analyze whether the restrictions contained in the CSA are the least restrictive means of furthering the United States' compelling interest in complying with the Convention.