*23 Justice Stevens,
with whom Justice Thomas and Justice Breyer join, dissenting.
Petitioner Timothy Abbott, the father of A. J. A., has no authority to decide whether his son undergoes a particular medical procedure; whether his son attends a school field trip; whether and in what manner his son has a religious upbringing; or whether his son can play a videogame before he completes his homework. These are all rights and responsibilities of A. J. A.’s mother, respondent Jacquelyn Abbott. It is she who received sole custody, or “daily care and control,” of A. J. A. when the expatriate couple divorced while living in Chile in 2004. 495 F. Supp. 2d 635, 637, and n. 2 (WD Tex. 2007). Mr. Abbott possesses only visitation rights.
On Ms. Abbott’s custodial rights, Chilean law placed a restriction: She was not to travel with her son outside of Chile without either Mr. Abbott’s or the court’s consent. Put differently, Mr. Abbott had the opportunity to veto Ms. Abbott’s decision to remove A J. A. from Chile unless a Chilean court overrode that veto. The restriction on A. J. A.’s and Ms. Abbott’s travel was an automatic, default provision of Chilean law operative upon the award of visitation rights under Article 48 of Chile’s Minors Law 16,618. It is this travel restriction — also known as a ne exeat clause — that the Court today declares is a “‘righ[t] of custody’” within the meaning of the Hague Convention on the Civil Aspects of International Child Abduction (Convention), Oct. 25, 1980, T. I. A. S. No. 11670, S. Treaty Doc. No. 99-11. Ante, at 5.
Because the Court concludes that this travel restriction constitutes a right of custody, and because Ms. Abbott indisputably violated the restriction when she took A. J. A. from Chile without either Mr. Abbott’s or the court’s permission, Mr. Abbott is now entitled to the return of A. J. A. to Chile under the terms of the Convention. Thus, absent a finding of an exception to the Convention’s powerful return remedy, see ante, at 22, and even if the return is contrary to the *24 child’s best interests, an American court must now order the return of A. J. A. to Mr. Abbott, who has no legal authority over A. J. A., based solely on his possessing a limited veto power over Ms. Abbott’s ability to take A. J. A. from Chile. As I shall explain, use of the Convention’s return remedy under these circumstances is contrary to the Convention’s text and purpose.
I
When the drafters of the Convention gathered in 1980, they sought an international solution to an emerging problem: transborder child abductions perpetrated by noncustodial parents “to establish artificial jurisdictional links . . . with a view to obtaining custody of a child.” 1980 Conférence de La Haye de droit international privé, Enlevement d’enfants, E. Pérez-Vera, Explanatory Report ¶ 11 (Pérez-Vera Report), in 3 Actes et Documents de la Quatorziéme Session pp. 426, 428 (1982);[1] see also Convention Analysis 10504 (“[FJundamental purpose” of the Convention is “to protect children from wrongful international removals or retentions by persons bent on obtaining their physical and/or legal custody”). The drafters’ primary concern was to remedy abuses by noncustodial parents who attempt to circumvent adverse custody decrees (e. g., those granting sole custodial rights to the other parent) by seeking a more favorable judgment in a second nation’s family court system. Pérez-Vera Report ¶ 14, at 429.
The drafters determined that when a noncustodial parent abducts a child across international borders, the best remedy is return of that child to his or her country of habitual residence — or, in other words, the best remedy is return of the *25 child to his or her custodial parent. Id., ¶ 18, at 430. The drafters concluded that the same remedy should not follow, however, when a custodial parent takes a child from his or her country of habitual residence in breach of the other parent’s visitation rights, or “rights of access” in the Convention’s parlance. Id., ¶ 65, at 444-445. The distinction between rights of custody and rights of access, therefore, is critically important to the Convention’s scheme and purpose. It defines the scope of the available Convention remedies.
Article 5 defines these rights as follows:
“For the purposes of this Convention—
“a ‘rights of custody[5] shall include rights relating to the care of the person of the child and, in particular, the right to determine the child’s place of residence;
“6 ‘rights of access’ shall include the right to take a child for a limited period of time to a place other than the child’s habitual residence.” S. Treaty Doc. No. 99-11, at 7 (hereinafter Treaty Doc.).
Article 3 of the Convention provides that the removal or retention of a child is “wrongful,” and thus in violation of the Convention, only when the removal “is in breach of rights of custody.” Art. 3(a), ibid. The fact that a removal may be “wrongful” in the sense that it violates domestic law or violates only “rights of access” does not make it “wrongful” within the meaning of the Convention.
Only when a removal is “wrongful” under Article 3 may the parent who possesses custody rights force the child’s return to the country of habitual residence under the Convention’s remedial procedures, pursuant to Articles 8 through 20. For those removals that frustrate a noncustodial parent’s “rights of access,” the Convention provides that the noncustodial parent may file an application “to make arrangements for organizing or securing the effective exercise of rights of access”; but he may not force the child’s return. Art. 21, id., at 11. A parent without “rights of custody,” *26 therefore, does not have the power granted by Article 3 to compel the child’s return to his or her country of habitual residence. His rights are limited to those set forth in Article 21.
II
Mr. Abbott, claiming “rights of custody” by virtue of the travel restriction Chilean law places on Ms. Abbott, seeks the return of A. J. A. to Chile. Such relief is warranted only if A. J. A.’s removal was “wrongful” within the meaning of the Convention; as such, it must have been “in breach of [Mr. Abbott’s] rights of custody.”[2] Art. 3, id., at 7. Putting aside the effect of the travel restriction, it is undisputed that Ms. Abbott possesses “rights of custody” over A. J. A. while Mr. Abbott would possess “rights of access,” as those terms are used in the Convention. Brief for Petitioner 6; Brief for Respondent 6. The only issue in this case, therefore, is whether Mr. Abbott also possesses “rights of custody” within the meaning of the Convention by virtue of the travel restriction, or ne exeat clause,[3] that Chilean law imposes on *27 Ms. Abbott. In other words, the question is whether the “right” of one parent to veto the other parent’s decision to remove a child from the country, subject to judicial override, belongs in the category of “rights relating to the care of the person of the child and, in particular, the right to determine the child’s place of residence.” Art. 5(a), Treaty Doc., at 7. In my judgment, it clearly does not, and I need look no further than to the Convention’s text to explain why. See Medellin v. Texas, 552 U. S. 491, 506 (2008) (“The interpretation of a treaty, like the interpretation of a statute, begins with its text”).
Rights relating to the care of the child. The Court concludes that the veto power Mr. Abbott has over Ms. Abbott’s travel plans is equivalent to those rights “‘relating to the care of the person of the child.’ ” Ante, at 11. This is so, the Court tells us, because Mr. Abbott has a limited power to keep A. J. A. within Chile’s bounds and, therefore, indirectly to influence “the language the child speaks, the identity he finds, or the culture and traditions she will come to absorb.” Ibid. It is not nearly as self-evident as the Court assumes that Mr. Abbott’s veto power carries with it any ability to decide the language A. J. A. speaks or the cultural experiences he will have, ante, at 11-12. A. J. A.’s mere presence in Chile does not determine any number of issues, including: whether A. J. A. learns Spanish while there; whether he attends an American school or a British school or a local school; whether he participates in sports; whether he is raised Catholic or Jewish or Buddhist or atheist; whether he eats a vegetarian diet; and on and on. The travel restriction does not confer upon Mr. Abbott affirmative power to make any number of decisions that are vital to A. J. A.’s physical, psychological, and cultural development. To say that a limited power to veto a child’s travel plans confers, also, a right “relating to the care” of that child devalues the great wealth of decisions a custodial parent makes on a daily basis to attend to a child’s needs and development.
*28 The Court’s interpretation depends entirely on a broad reading of the phrase “relating to” in the Convention’s definition of “rights of custody.” It is, undeniably, broad language. But, as the Court reads the term, it is so broad as to be utterly unhelpful in interpreting what “rights of custody” means. We “cannot forget that we ultimately are determining the meaning of the term” rights of custody in this case, and we should not lose sight of the import of this term in construing the broad words that follow in its wake. Leocal v. Ashcroft, 543 U. S. 1, 11 (2004). I suppose it could be said that Mr. Abbott’s ability to decide whether A. J. A. spends the night with one of his Mends during a Saturday visit is also a “right relating to the care of the child.” Taken in the abstract — and to its most absurd — any decision on behalf of a child could be construed as a right “relating to” the care of a child.
Such a view of the text obliterates the careful distinction the drafters drew between the rights of custody and the rights of access. Undoubtedly, they were aware of the concept of joint custody. See Pérez-Vera Report ¶ 71, at 447 (“[Cjustody rights may have been awarded... to that person in his own right or jointly. It cannot be otherwise in an era when types of joint custody, regarded as best suited to the general principle of sexual non-discrimination, are gradually being introduced into internal law”). But just because rights of custody can be shared by two parents, it does not follow that the drafters intended this limited veto power to be a right of custody. And yet this, it seems, is how the Court understands the case: Because the drafters intended to account for joint custodial arrangements, they intended for this travel restriction to be joint custody because it could be said, in some abstract sense, to relate to care of the child. I fail to understand how the Court’s reading is faithful to the Convention’s text and purpose, given that the text expressly contemplates two distinct classes of parental rights. Today’s decision converts every noncustodial parent with ac *29 cess rights — at least in Chile — into a custodial parent for purposes of the Convention.
On this point, it is important to observe the effect of the Court’s decision to classify the travel restriction as a right “relating to” A. J. A.’s care. Mr. Abbott possesses no legal authority presently to exercise care or control of A. J. A., or to make decisions on his behalf. The Court would nevertheless read the Convention to require A. J. A.’s return to a parent without such rights merely because the travel restriction, in an abstract sense, could be said to relate to A. J. A.’s care. The Court fails to explain how a parent who otherwise possesses no legal authority to exercise “charge,” “supervision,” or “management” over a child, see Webster’s Third New International Dictionary 338 (1986) (hereinafter Webster’s 3d) (5th definition of “care”), can become a joint custodian of a child merely because he can attempt to veto one of the countless decisions the child’s other parent has sole legal authority to make on the child’s behalf.
The right to determine the child's place of residence. The Court also concludes that Mr. Abbott’s veto power satisfies the Convention’s definition of custodial rights because it is, in the Court’s view, a “right to determine the child’s place of residence.” Art. 5(a), Treaty Doc., at 7. I disagree with the Court’s assessment of the significance and meaning of this phrase, both on its face and within the context of the Convention’s other provisions.
As an initial matter, the Court’s reading of the Convention depends on isolating the phrase “and, in particular, the right to determine the child’s place of residence” to refer to a freestanding right separate and apart from the rights related to the care of the child. I do not agree with this view of the text, nor did the Convention’s drafters:
“The Convention seeks to be more precise by emphasizing, as an example of the ‘care’ referred to [in the ‘“rights of custody”’ clause, Art. 5(a)], the right to determine the child’s place of residence. However, if *30 the child, although still a minor at law, has the right itself to determine its own place of residence, the substance of the custody rights will have to be determined in the context of other rights concerning the person of the child.” Pérez-Vera Report ¶ 84, at 452 (emphasis added).
The drafters thus intended the “right to determine the child’s place of residence” to be an “example” of what the Convention means by “care of the person of the child.” It is indicative of the “substance” of what it means to be a custodial parent. The definition is not, as the Court would have it, one stick in the bundle that may be parsed as a singular “‘righ[t] of custody,’” ante, at 5; rather, it is a shorthand method to assess what types of rights a parent may have. The parent responsible for determining where and with whom a child resides, the drafters assumed, would likely also be the parent who has the responsibility to “care” for the child.
Yet even assuming, as the Court does, that the “right to determine the child’s place of residence,” Art. 5(a), Treaty Doc., at 7, is divisible from the “care” of the child, ibid., I still fail to understand how a travel restriction on one parent’s exercise of her custodial rights is equivalent to an affirmative “right to determine the child’s place of residence.” Analyzing its text, in the context of the Convention’s focus on distinguishing custodial parents from noncustodial ones, leads me to conclude that the “right to determine the child’s place of residence” means the power to set or fix the location of the child’s home. It does not refer to the more abstract power to keep a child within one nation’s borders.
To “determine” means “to fix conclusively or authoritatively” or “to settle a question or controversy.”[4] Webster’s *31 3d, at 616. A “place” is a “physical environment” or “a building or locality used for a special purpose.” Id., at 1727. “Residence,” even standing alone, refers to a particular location — and not, more generally, to a nation or country. In the law, “residence” can mean: “[t]he act or fact of living in a given place for some time”; “[t]he place where one actually lives”; or “[a] house or other fixed abode; a dwelling.” Black’s Law Dictionary 1423 (9th ed. 2009).[5] Lay definitions of “residence” similarly describe a specific location: “the act or fact of abiding or dwelling in a place for some time”; “the place where one actually lives or has his home”; or “a temporary or permanent dwelling place, abode, or habitation.” Webster’s 3d, at 1931. It follows that a “place of residence” describes a “physical” location in which a child “actually lives.”
The Court’s reading of this text depends on its substitution of the word “country” for the word “place.” Such a substitution is not illogical, of course, in light of the Convention’s international focus. See Croll v. Croll, 229 F. 3d 133, 147, 148 (CA2 2000) (Sotomayor, J., dissenting) (reading “place of residence” to mean “authority over the child’s more specific *32 living arrangements” “ignores the basic international character of the Hague Convention”). But it is inconsistent with the Convention’s text and purpose.
When the drafters wanted to refer to country, they did. For example, in Article 3, the drafters explained that rights of custody should be defined by looking to “the law of the State in which the child was habitually resident. ” Art. 3(a), Treaty Doe., at 7. Had the drafters intended the definition of the child’s “place of residence” in Article 5 to refer to his or her “State” or country of “residence,” they could have defined the “right” at issue as “the right to determine the child’s State of habitual residence.” But they did not, even though they used the phrase “State of habitual residence” no fewer than four other times elsewhere within the Convention’s text.[6] Moreover, the drafters also explained that “reference[s] to habitual residence in [a] State shall be construed as referring to habitual residence in a territorial unit of that State.” Art. 31(a), id., at 13 (emphasis added). The point is: When the drafters wanted to refer to a particular geographic unit, they did so.
Instead, the drafters elected the formulation “place of residence,” which is also utilized similarly in the definition of “rights of access.” See Art. 5(b), id., at 7 (defining “‘rights of access’ ” to include “the right to take a child for a limited *33 period of time to a place other than the child’s habitual residence” (emphasis added)). And they utilized this phrase only within one particular article, as opposed to their more frequent use of “State of habitual residence” throughout the Convention. In interpreting statutory text, we ordinarily presume that the use of different words is purposeful and evinces an intention to convey a different meaning. See, e. g., Russello v. United States, 464 U. S. 16, 23 (1983) (“We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship”). There is no reason we should presume otherwise in the context of treaties.
Accordingly, I would give “place of residence” the location-specific meaning its plain text connotes, irrespective of the fact that this Convention concerns international abduction. The right described by the Convention is the right to decide, conclusively, where a child’s home will be. And this makes a good deal of sense. The child lives with the parent who has custodial rights or, in the language of the Convention, “care of the person of the child,” Art. 5(a), Treaty Doc., at 7. The child’s home — his or her “place of residence” — is fixed by the custody arrangement.[7] This comports too with the Convention’s decision to privilege the rights of custodians over the rights of those parents with only visitation rights.
Understanding the effect of a travel restriction. So, the question we confront is whether a travel restriction on one parent’s right to embark on international travel with his or her child creates in the other parent a “right to determine the child’s place of residence” or the ability “to fix conclu *34 sively” the child’s “physical” “home.” Before answering this question, it is important to understand the nature of the travel restriction we must classify.
The departure of a minor from Chile — including when that child lives in a married, two-parent household — is governed by Article 49 of that country’s Minors Law 16,618. Under Chilean law, no minor is allowed outside of the country without his or her parents’ authorization. Minors Law 16,618, Art. 49, App. to Pet. for Cert. 61a-62a. Ordinarily, if the judge has entrusted custody of a child to only one parent, the child may not leave without that parent’s — the custodial parent’s — permission. See ibid,.; see also id., at 61a (“If the judge has entrusted custody to one of the parents or to a third party, the legitimate child may not leave except under authorization of the person to whom he has been entrusted”). But the statute further provides that if the noncustodial parent has been granted visitation rights, the authorization of the parent with visitation rights shall also be required: “Once the court has decreed the obligation to allow visits pursuant to the preceding article,[8] authorization of the father or mother who has the right to visit a child shall also be required.” Ibid. The statute provides, also, an important backstop in the event a noncustodial parent denies authorization “without good reason”: A Chilean court may grant the minor or his parent permission to leave the country. Id., at *35 62a. Finally, if the custodial parent does not return the child to Chile within the time authorized, “the judge may decree the suspension of alimony that may have been decreed.” Ibid.
Returning, then, to the question at hand: By virtue of the restriction Chilean law places on Ms. Abbott’s movement, Mr. Abbott has no “right to determine [A. J. A’s] place of residence.” He cannot “conclusively” “fix,” “settle,” or “determine” the place where A. J. A. “actually lives or has his home.” See supra, at 30-31. True, the travel restriction bestows upon the noncustodial parent a limited power to prevent his child from leaving the country without his permission, but it does not grant an affirmative power to fix or set the location of the child’s home. Mr. Abbott has no power whatever to determine where A. J. A. actually lives within the nearly 300,000 square miles that compose Chile. Even more important, Mr. Abbott has no power whatever to select another country in which A. J. A. would live, were Mr. Abbott’s work to take him to another country altogether. In sum, a right to object to a proposed departure gives a parent far less authority than a right to determine where the child shall reside. Moreover, the right to determine where to live within a country, as well as what country to live in, is far broader than the limited right to object to a child’s travel abroad.
In my view, the “right” Mr. Abbott has by virtue of the travel restriction is therefore best understood as relating to his “rights of access,” as the Convention defines that term— and not as a standalone “ *righ[t] of custody,’ ” as the Court defines it, ante, at 5. Chile’s statutory travel restriction provision is plainly ancillary to the access rights the Chilean family court granted to him as the noncustodial parent. By its terms, the obligation on the custodial parent to seek the other parent’s permission before removing the child from Chile only operates upon the award of visitation rights; it has nothing to do with custody rights. And it operates au *36 tomatically to facilitate the noncustodial parent’s ability to access the child and to exercise his visitation rights. In the best of all possible circumstances, Mr. Abbott’s limited veto power assures him relatively easy access to A. J. A. so that he may continue a meaningful relationship with his son. But this power, standing alone, does not transform him into a custodian for purposes of the Convention’s return remedy. Instead, it authorizes him, pursuant to Article 21, to seek assistance from this country in carrying out the Chilean family court’s visitation order.
III
Although the Court recognizes, as it must, that “ ‘[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text,”’ ante, at 10 (quoting Medellín, 552 U. S., at 506), the Court’s analysis is atextual — at least as far as the Convention's text goes. The Court first relies on the text of the Chilean law at issue and a single Chilean administrator’s alleged interpretation thereof.[9] See ante, at 10. *37 While it is true that the meaning of Chile’s statute matters to our determining whether a parent has taken a child in “breach of rights of custody . . ..under the law of the State in which the child was habitually resident immediately before the removal or retention,” Art. 3(aJ, Treaty Doc., at 7, it does not and should not inform what the Convention’s definition of “rights of custody” means in the first place.
The Court also reminds us that the Convention’s terms are to be broadly construed. See ante, at 19-20. To be sure, the Convention’s leading interpretive authority informs us that the Convention’s understanding of what constitutes “rights of custody” is broad and flexible. See Pérez-Vera Report ¶¶ 67, 71, 84, at 446, 447, 451-452. And we are to apply its terms to “allo[w] the greatest possible number of cases to be brought into consideration.” Id., ¶ 67, at 446. But such breadth should not circumvent the Convention’s text in order to sweep a travel restriction under the umbrella of rights of custody.
A reading as broad and flexible as the Court’s eviscerates the distinction the Convention draws between rights of custody and rights of access. Indeed, the Court’s reading essentially voids the Convention’s Article 21, which provides a separate remedy for breaches of rights of access. If a viola *38 tion of this type of provision were not a breach of the rights of access, I find it quite difficult to imagine what the Convention’s drafters had in mind when they created a second, lesser remedy for the breach of access rights. The drafters obviously contemplated that some removals might be in violation of the law of the child’s home nation, but not “wrongful” within the meaning of the Convention — ! e., not in breach of “rights of custody.” This is precisely why Article 5 carefully delineates between the two types of parental rights in the first place. And this is precisely why Article 21 exists.
Nevertheless, the Court has now decreed that whenever an award of visitation rights triggers a statutory default travel restriction provision, or is accompanied by a travel restriction by judicial order, a parent possesses a right of custody within the meaning of the Convention. Such a bright-line rule surely will not serve the best interests of the child in many cases. See id., ¶ 25, at 432. It will also have surprising results. In Chile, for example, as a result of this Court’s decision, all parents — so long as they have the barest of visitation rights — now also have joint custody within the meaning of the Convention and the right to utilize the return remedy.[10]
*39 It bears emphasis that such a result — treating the type of travel restriction at issue in this case as part of “rights of custody” — will undermine the Convention’s careful balance between the “rights of custody and the “rights of access”:
“Although the problems which can arise from a breach of access rights, especially where the child is taken abroad by its custodian, were raised during the Fourteenth Session, the majority view was that such situations could not be put in the same category as the wrongful removals which it is sought to prevent.
“This example, and others like it where breach of access rights profoundly upsets the equilibrium established by a judicial or administrative decision, certainly demonstrate that decisions concerning the custody of children should always be open to review. This problem however defied all efforts of the Hague Conference to coordinate views thereon. A questionable result would have been attained had the application of the Convention, by granting the same degree of protection to custody and access rights, led ultimately to the substitution of the holders of one type of right by those who held the other.” Id., ¶ 65, at 444-445 (emphasis added; footnote omitted).
It seems the very same authority on which the Court relies to support its broad, flexible reading of the Convention’s terms also tell us that the drafters expressly rejected the very outcome the Court reaches today. Far from “ren-derjmg] the Convention meaningless,” ante, at 13, a faithful reading of the Convention’s text avoids the very “questionable result” its drafters foresaw and attempted to preclude *40 were they to extend “the same degree of protection” “to custody and access rights.” Pérez-Vera Report ¶ 65, at 445.
IV
Hence, in my view, the Convention’s language is plain and that language precludes the result the Court reaches. See Sumitomo Shoji America, Inc. v. Avagliano, 457 U. S. 176, 180 (1982). In these circumstances, the “clear import of treaty language controls” the decision. Ibid. To support its reading of the text, however, the Court turns to authority we utilize to aid us in interpreting ambiguous treaty text: the position of the Executive Branch and authorities from foreign jurisdictions that have confronted the question before the Court.[11] Ante, at 15-18. Were I to agree with the Court that it is necessary to turn to these sources to resolve the question before us, I would not afford them the weight the Court does in this case.
Views of the Department of State. Without discussing precisely why, we have afforded “great weight” to “the meaning given [treaties] by the departments of government particularly charged with their negotiation and enforcement.” Kolovrat v. Oregon, 366 U. S. 187, 194 (1961); see also Sumitomo, 457 U. S., at 184-185; Factor v. Lauben-heimer, 290 U. S. 276, 294 (1933). We have awarded “great weight” to the views of a particular government department even when the views expressed by the department are newly memorialized, see Sumitomo, 457 U. S., at 184, n. 10, and even when the views appear contrary to those expressed by the department at the time of the treaty’s signing and negotiation, ibid. In this ease, it appears that both are true: The *41 Department of State’s position, which supports the Court’s conclusion, is newly memorialized, see Brief for United States as Amicus Curiae 21, n. 13, and is possibly inconsistent with the Department’s earlier position, see Convention Analysis 10504-10505.[12]
Putting aside any concerns arising from the fact that the Department’s views are newly memorialized and changing, I would not in this case abdicate our responsibility to interpret the Convention’s language. This does not seem to be a matter in which deference to the Executive on matters of foreign policy would avoid international conflict, cf. Itel Containers Int’l Corp. v. Huddleston, 507 U. S. 60, 76 (1993) (acknowledging that “the nuances of foreign policy ‘are much more the province of the Executive Branch and Congress than of this Court’ ” (quoting Container Corp. of America *42 v. Franchise Tax Bd., 463 U. S. 159, 196 (1983))); the State Department has made no such argument. Nor is this a case in which the Executive’s understanding of the treaty’s drafting history is particularly rich or illuminating.[13] See Factor, 290 U. S., at 294-295 (observing that “diplomatic history”— “negotiations and diplomatic correspondence of the contracting parties relating to the subject matter” — is entitled to weight). Finally, and significantly, the State Department, as the Central Authority for administering the Convention in the United States, has failed to disclose to the Court whether it has facilitated the return of children to America when the shoe is on the other foot.[14] See Brief for United States as Amicus Curiae 4, n. 3 (describing responsibilities of the Central Authority). Thus, we have no informed basis to assess the Executive’s postratification conduct, or the conduct of other signatories, to aid us in understanding the accepted meaning of potentially ambiguous terms. See Zicherman v. Korean Air Lines Co., 516 U. S. 217, 227-228 (1996) (considering “postratification conduct of the contracting parties”); Charlton v. Kelly, 229 U. S. 447, 468 (1913) (affording *43 “much weight” to the fact that the “United States has always construed its obligation” under a treaty in a particular way and had acted in accord).
Instead, the Department offers us little more than its own reading of the treaty’s text. Its view is informed by no unique vantage it has, whether as the entity responsible for enforcing the Convention in this country or as a participating drafter. The Court’s perfunctory, one-paragraph treatment of the Department’s judgment of this matter only underscores this point. Ante, at 15. I see no reason, therefore, to replace our understanding of the Convention’s text with that of the Executive Branch.
Views of foreign jurisdictions. The Court believes that the views of other signatories to the Convention deserve special attention when, in a case like this, “Congress has directed that ‘uniform international interpretation of the Convention’ is part of the Convention’s framework.” Ante, at 16 (quoting 42 U. S. C. § 11601(b)(3)(B)). This may well be correct, but we should not substitute the judgment of other courts for our own. See Olympic Airways v. Husain, 540 U. S. 644, 655, n. 9 (2004). And the handful of foreign decisions the Court cites, see ante, at 16-17, provide insufficient reason to depart from my understanding of the meaning of the Convention, an understanding shared by many U. S. Courts of Appeals. See, e. g., 542 F. 3d 1081 (CA5 2008) (case below); Gonzalez v. Gutierrez, 311 F. 3d 942, 949 (CA9 2002) (parent’s right to “refuse permission for his children to leave Mexico” “hardly amounts to a right of custody, in the plainest sense of the term”); Croll, 229 F. 3d, at 140 (“If we were to enforce rights held pursuant to a ne exeat clause by the remedy of mandatory return, the Convention would become unworkable.... It does not contemplate return of a child to a parent whose sole right — to visit or veto — imposes no duty to give care”); Fawcett v. McRoberts, 326 F. 3d 491 (CA4 2003). Indeed, the interest in having our courts cor *44 rectly interpret the Convention may outweigh the interest in having the ne exeat clause issue resolved in the same way that it is resolved in other countries. Cf. Breard v. Greene, 523 U. S. 371, 375 (1998) (per curiam) (“[W]hile we should give respectful consideration to the interpretation of an international treaty rendered by an international court with jurisdiction to interpret such, it has been recognized in international law that, absent a clear and express statement to the contrary, the procedural rules of the forum State govern the implementation of the treaty in that State”).
I also fail to see the international consensus — let alone the “broad acceptance,” ante, at 16 — that the Court finds among those varied decisions from foreign courts that have considered the effect of a similar travel restriction within the Convention’s remedial scheme. The various decisions of the international courts are, at best, in equipoise. Indeed, the Court recognizes that courts in Canada and France have concluded that travel restrictions are not “rights of custody” within the meaning of the Convention. Ante, at 17-18.
And those decisions supportive of the Court’s position do not-offer nearly as much support as first meets the eye. For example, the English Court of Appeal decision on which the Court primarily relies, ante, at 16, appears to have decided a different issue. True, that court considered the effect of a similar travel restriction on both parents following the award of “ ‘custody’ ” to the child’s mother. C. v. C., [1989] 1 W. L. R. 654, 656 (C. A.). But the family court had also decreed, at the time it awarded “ ‘custody’ ” to the mother, that both parents would remain “ ‘joint guardians’ ” of the child. Ibid. Moreover, in the time between the mother’s removal of the child and the father’s petitioning for his return, the father had returned to the family court in Sydney, obtained an order for the child’s return, and received immediate custody of the child. Ibid. Comparable facts do not exist in this ease. Cf. Olympic Airways, 540 U. S., at 655, n. 9 (not *45 ing that “we are hesitant” to follow decisions of other signatory courts when “there are substantial factual distinctions between” the cases). Similar factual distinctions — involving, typically, joint guardianship rights or shared decision-making rights — are present in other of the foreign eases relied upon by the Court and Mr. Abbott.[15]
Those foreign courts that have reached a position consistent with my own, the Court is right to point out, have also done so in slightly different factual scenarios. Ante, at 17. The Supreme Court of Canada, for example, first encountered a ne exeat provision as part of an interim custody order in Thomson v. Thomson, [1994] 3 S. C. R. 551, 589-590, 119 D. L. R (4th) 253, 281. Although the Canadian high court concluded that a removal in breach of the temporary travel restriction was wrongful, it emphasized the interim nature of the provision, see n. 9, supra, and explained that the case would be different with a permanent order. See Thomson, [1994] 3 S. C. R. at 589, 119 D. L. R. (4th), at 281 (“Such a [permanent] clause raises quite different issues. It is usually intended to ensure permanent access to the noncustodial parent. The right of access is, of course, important but, as we have seen, it was not intended to be given the *46 same level of protection by the Convention as custody”).[16] The Canadian Supreme Court later affirmed this important distinction in D. S. v. V. W., [1996] 2 S. C. R. 108, 139, 134 D. L. R. (4th) 481, 503 (rejecting argument that “any removal of a child without the consent of the parent having access rights” should authorize return remedy because such a reading of the Convention would “indirectly afford the same protection to access rights as is afforded to custody rights”).
In sum, the decisions relied upon by the Court and Mr. Abbott from other signatories do not convince me that we should refrain from a straightforward textual analysis in this case in order to make way for a “uniform international interpretation” of the Convention. 42 U. S. C. § 11601(b)(3)(B). There is no present uniformity sufficiently substantial to justify departing from our independent judgment on the Convention’s text and purpose and the drafters' intent.
V
At bottom, the Convention aims to protect the best interests of the child. Pérez-Vera Report ¶ 25, at 432. Recognizing that not all removals in violation of the laws of the country of habitual residence are contrary to a child’s best interests, the Convention provides a powerful but limited return remedy. The judgment of the Convention’s drafters was that breaches of access rights, while significant (and thus expressly protected by Article 21), are secondary to protecting the child’s interest in maintaining an existing custodial relationship.
*47 Today, the Court has upended the considered judgment of the Convention’s drafters in favor of protecting the rights of noncustodial parents. In my view, the bright-line rule the Court adopts today is particularly unwise in the context of a treaty intended to govern disputes affecting the welfare of children.
I, therefore, respectfully dissent.

 As the Court recognizes, see ante, at 19, the Executive Branch considers the Pérez-Vera Report “the official history” for the Convention and “a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it.” Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10503 (1986) (hereinafter Convention Analysis).

 Indisputably, Ms. Abbott’s removal of A. J. A. from Chile was wrongful in the generic sense of the word. She violated Chilean law when she took A. J. A. to Texas because she sought neither Mr. Abbott’s permission nor the court’s authorization before doing so. She violated both the existing “ne exeat” order imposed by judicial decree in the couple’s custody dispute, see ante, at 6, as well as Chilean statutory law defining the access rights of noncustodial parents, see Minors Law 16,618, Art. 49, App. to Pet. for Cert. 61a. The removal was illegal, then, but it was only wrongful within the meaning of the Convention if it was in breach of Mr. Abbott’s rights of custody. Unfortunately, I fear the Court’s preoccupation with deterring parental misconduct — even, potentially, at the sake of the best interests of the child — has caused it to minimize this important distinction.

 The Court repeatedly refers to “ne exeat rights,” ante, at 7,13,15,16, 18,19, and 20, as if the single travel restriction at issue in this case were on a par with the multiple rights commonly exercised by custodial parents. Chile’s statutory ne exeat provision is better characterized as a restriction on the travel of both the minor and the custodial parent than as a bundle of “rights” possessed by the noncustodial parent.

 To “determine” can also mean, as the Court observes, “‘[t]o set bounds or limits to,’” ante, at 11 (quoting Webster’s New International Dictionary-Til (2d ed. 1954) (hereinafter Webster’s 2d) (1st definition)). However, this definition of “to determine” makes little functional sense as applied *31 to this treaty. In the context of understanding the meaning of rights of custody, the phrase “to determine” cannot be so indeterminate as to merely set “limits to” a child’s place of residence.
Although the Court emphasizes that the definition of “to determine” on which it relies is the first such entry in Webster’s, ante, at 11, it is worth noting that surely the Court would not rely on the first such definition of the word “care” in that source (“[sjuffering of mind; grief; sorrow”) to understand the Convention’s use of that word, see Webster’s 2d, at 405. Instead, the fifth definition of that word — “[c]harge, oversight, or management” — is clearly the relevant one. The point is only that context, as well as common sense, matters when selecting among possible definitions.

 See, e. g., Preamble, Treaty Doc., at 7 (“[d]esiring to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence” (emphasis added)); Art. 8(f), id., at 9 (stating that an application for return may be accompanied by “a certificate ... emanating from ... competent authority of the State of the child’s habitual residence” (emphasis added)); Art. 14, id., at 10 (explaining that when determining whether a removal is wrongful, a contracting state “may take notice directly of the law of . . . the State of the habitual residence of the child” (emphasis added)); Art. 15, ibid, (authorizing contracting state to obtain a decree from “the authorities of the State of the habitual residence of the childT a decision on whether removal was wrongful before ordering return (emphasis added)).

I do not mean to suggest by my view of the significance of a travel restriction that there could not be a custody arrangement in which both parents have the “right to determine the child’s place of residence.” Art. 5(a), id., at 7. My view is only that the type of ne exeat provision at issue in this case does not, by itself, confer such an affirmative right.

 The “preceding article” referred to, Article 48, simply provides: “Each time a minor is entrusted to one of the parents or a third person, such decision must include the obligation to allow the non-custodial parent to exercise his or her right to visit. The decision should also specify the way in which this right will be exercised. The judge may order, ex officio, upon the parties petition or in special cases, that the same authorization be extended, to the minor’s ascendants or siblings, through the means and under the conditions set by the judge. Ascendants and siblings should be identified.” Memorandum from Graciela I. Rodriguez-Ferrand, Senior Legal Specialist, Law Library of Congress, to Supreme Court Library (Apr. 1, 2010) (available in Clerk of Court’s case file (containing English translation of Minors Law 16,618, Art. 48)).

 Because differences in statutory provisions, as well as cultural differences and personal predilections, may affect the opinions of local officials, I would attach no weight to the letter from Paula Strap Camus, describing Article 49 of Chile’s Minors Law 16,618 as establishing a shared right to determine the place of residence of a child. Moreover, we have no obligation to defer, on questions of treaty interpretation, to the nonjudicial decisions of another signatory state, let alone a return request — a piece of advocacy — filed on behalf of Chile in another case.
In any event, the letter cited offers much less support for the Court’s position than meets the eye. Unlike in this case, in which a Chilean court has already decreed Ms. Abbott to be A. J. A.’s sole custodian, in Villegas Duran v. Arribada Beaumont, “no Judge of the Republic of Chile has granted the custody of the child to her mother ....” Letter from Paula Strap Camus, Director General, Corporation of Judicial Assistance of the Region Metropolitana to National Center for Missing and Exploited Children (Jan. 17,2006), App. to Pet. for Cert, in Villegas Duran v. Arribada Beaumont, O. T. 2008, No. 08-775, p. 36a, cert. pending [Reporter’s Note: See post, p. 921]. In other words, Ms. Camus’ letter request for the child’s return in that case depends on a provision of Article 49 not at *37 issue in this case: “If the custody of a legitimate child has not been entrusted by the judge to any of Ids parents or to a third party, the child may not leave without authorization of both parents.” App. to Pet. for Cert. 61a. The travel restriction that bound Ms. Abbott in this case, however, arose “[o]nce the court... decreed the obligation to allow visits” by Mr. Abbott. Ibid. Although not before us, there may be a sound basis for distinguishing the legal effect and significance of a travel restriction in effect prior to an award of custody to either or both parents, from one that occurs ancillary to the award of visitation rights to a parent who has no custodial rights. Moreover, the U. S. Department of State, at the time the Convention was ratified, believed that the Convention would require return in these circumstances: “Children who are wrongfully removed or retained prior to the entry of a custody order are protected by the Convention. There need not be a custody order in effect in order to invoke the Convention’s return provisions.” Convention Analysis 10505.

 In 2003, the latest year for which statistics appear available, Chile's Central Authority, which is the entity responsible for administering its obligations under the Hague Convention, made five outgoing “access applications” under Article 21. Hague Conference on Private International Law, International Child Abduction, N. Lowe, A Statistical Analysis of Applications Made in 2003 Under the Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, Part II-National Reports, p. 125 (Prelim. Doc. No. 3,2006-2007) (hereinafter Lowe Analysis). Were the Court correct — and were the view the Court ascribes to Chile’s interpretation of its own law also correct, see ante, at 10 — all of Chile’s outgoing applications under the Convention almost certainly should have been “return applications” because any person with rights of access under Chilean law, also has a right of custody by virtue of *39 the statutory ne exeat provision. It is plain that even Chilean officials have not thought correct the Court’s interpretation of the intersection of the travel restriction in Article 49 of its Minors Law 16,618 and the Convention.

 See Vienna Convention on the Law of Treaties, Art. 32, May 23,1969, S. Treaty Doc. No. 92-12, p. 20,1155 U. N. T. S. 33Í, 340 (“Recourse may be had to supplementary means of interpretation... when the interpretation ... (a) leaves the meaning ambiguous or obscure; or (6) leads to a result which is manifestly absurd or unreasonable”).

 The State Department explained to the Senate at the time it sought ratification of the Convention that the “fundamental purpose of the Hague Convention” was “to protect children from wrongful international removals or retentions by persons bent on obtaining their physical and/or legal custody.” Convention Analysis 10504. I find it quite unlikely, in light of its framing of the “fundamental purpose” of the Convention, that the State Department would have agreed at the time that a removal was “wrongful” within the meaning of the Convention when a parent with physical custody of a child took that child to another country, even when that removal was in violation of a restriction on the custodial parent’s travel rights. See also Brief for Eleven Law Professors as Amici Curiae 4-5, n. 7. Even more telling, however, is the fact that, in a response to a questionnaire used by the Convention’s drafters in preparing the treaty, the United States characterized a ne exeat right as one with “the purpose of preserving the jurisdiction of the state in the custody matter and of safeguarding the visitation rights of the other parent.” 1980 Conference de La Haye de droit international privé, Enlevement d’enfants, Replies of the Governments to the Questionnaire, in 3 Actes et Documents de la Quatorziéme Session, pp. 85,88 (1982). Such a description is inconsistent with the Department’s current position that a ne exeat clause is a freestanding right of custody within the meaning of the Convention. See Brief for United States as Amicus Curiae 7.

 This only underscores what seems quite clear: Whatever contemporary international consensus the Court claims has now emerged, “that view was not generally formulated when the Convention was drafted in 1980.” Ante, at 18. I understand the Court’s reference to contemporary consensus to depend on the views of contemporary scholars and individual signatory states developed postratification, including the views of the Special Commission, a voluntary post hoc collective body with no treaty-making authority, see ante, at 18-19. Even assuming that the Court is correct that consensus has emerged after the Convention was written and ratified that ne exeat rights should be “rights of custody,” in my view this provides no support at all for the position that the Convention’s drafters had these types of rights in mind and intended for the Convention to treat them as rights of custody. To the contrary, I think it tends to prove the opposite point.

 This is somewhat surprising given that in 1999 the Department made 183 outgoing applications for return of children to the United States and made 85 such requests in 2003. Lowe Analysis 479.

 See Bundesverfassungsgericht [BVerfG] [Fed. Constitutional Ct.] July 18,1997, 2 BvR 1126/97, ¶¶ 13-15 (Ger.) (Dept. of State transí.) (considering ne exeat provision -with respect to a noncustodial parent who also had joint authority to decide major life decisions for the child); M. S. H. v. L. H., [2000] 3 I. R. 390, 401 (Sup. Ct., Ireland) (evaluating effect of ne exeat provision when parents had shared “rights of parental responsibility,” including “‘all the rights, duties, powers, responsibilities and authority which, by law, a parent of a child has in relation to a child and his property’ ”); Sonderup v. Tondelli, 2001 (1) SA 1171, 1177-1178 (Constitutional Ct., S. Afr. 2000) (evaluating removal where parents were both granted “joint guardianship” of the minor); CA 5271/92 Foxman v. Foxman, [1992], §3(C) (Sup. Ct., Isr.) (K. Chagall transí.) (examining whether removal was wrongful in the context of a custody and visitation agreement that provided broadly that “each parent needs the consent of the other to every significant change in the children’s residency”).

 The Canadian high court also observed that construing a permanent travel restriction on one parent as creating a right of custody in the other has “serious implications for the mobility rights of the custodian.” Thomson, [1994] 3 S. C. R., at 590, 119 D. L. R. (4th), at 281. A French Court of Appeals made a similar observation in Procureur de la République de Périgueux v. Mme S. (TGI, Périgueux, Mar. 17,1992), in 82 Revue Critique de Droit International Privé 650, 651-653 (Oct.-Dee. 1993).