# Article 17 *Bis* of the Air Transport Agreement with the European Union

Article 17 *bis* of the Air Transport Agreement Between the United States of America and the European Community and Its Member States does not provide an independent basis upon which the United States may deny a permit to an air carrier of a Party to the Agreement if that carrier is otherwise qualified to receive such a permit.

April 14, 2016

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF TRANSPORTATION

You have asked whether Article 17 *bis*\* of the Air Transport Agreement between the United States of America and the European Community and Its Member States, signed on April 25 and 30, 2007, as amended (the "Agreement"), provides an independent basis upon which the United States may deny an air carrier of the European Union a permit to provide foreign air transportation services to and from the United States, assuming that the carrier is otherwise qualified to receive such a permit under Department of Transportation ("DOT" or "Department") authorities and the Agreement.[1] You have indicated that, in your view, Article 17 *bis* does not provide such an independent basis for denying a permit. *See* Letter for Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Kathryn B. Thomson, General Counsel, Department of Transportation, *Re: DOT Legal Analysis of Article 17* bis *of the U.S.-EU Aviation Agreement* (Mar. 17, 2016) ("DOT Legal Analysis"). And the Department of State ("State Department" or "State")

---

\* Editor's Note: As used here, the term *bis* "indicates a second article with the same number in a convention," as when "a treaty is amended and a new article on a subject already addressed is inserted next to the old article." James R. Fox, *Dictionary of International and Comparative Law* 36 (3d ed. 2003).

[1] The agreement between the Parties was initially signed in 2007. *See* Air Transport Agreement Between the United States of America and the European Community and Its Member States, Apr. 25–30, 2007, 46 I.L.M. 470 ("2007 ATA"). In 2010, this agreement was amended by the Protocol to Amend the Air Transport Agreement Between the United States of America and the European Community and Its Member States, Signed on 25 and 30 April 2007, June 24, 2010, 2010 O.J. (L 223) 3 ("2010 Protocol"). References in this opinion to the "Agreement" are to the 2007 ATA, as amended by the 2010 Protocol. References to the 2007 ATA and the 2010 Protocol are to those specific documents.

has indicated that it agrees with your conclusion. *See* Letter for Karl Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Brian J. Egan, Legal Adviser, Department of State (Apr. 13, 2016) ("State Legal Analysis"). Nonetheless, because this question is important to the Department of Transportation and likely to recur, the Secretary of Transportation asked you to solicit our opinion. *See* Letter for Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Kathryn B. Thomson, General Counsel, Department of Transportation, *Re: Interpretation of Article 17* bis *of the US-EU Aviation Agreement* at 1 (Mar. 11, 2016).

We note at the outset the limited nature of your question. You have not asked for our views on the propriety of granting a permit to any particular foreign air carrier, and we do not express any views on that subject. Although you have advised us that there are ongoing permitting proceedings related to applications by Norwegian Air International and Norwegian UK, two foreign air carriers that seek to provide services under the Agreement, we express no view on whether the Secretary should or should not grant those carriers any relevant permits. We are also aware that DOT has various domestic authorities under which it evaluates permit applications. *See, e.g.*, 49 U.S.C. § 41301 *et seq.* You have asked us to assume that the requirements for granting a permit under these authorities have been satisfied, and we are not aware of any additional United States authorities that would be relevant to granting such a permit. The question we address is thus limited to interpreting the Agreement. That question is: Assuming an air carrier satisfies the relevant preconditions for a permit set forth elsewhere in the Agreement, may the Department nonetheless deny a permit application because, in its view, granting the permit would undermine the principles articulated in Article 17 *bis*? For the reasons set forth below, we agree with DOT and State that if an air carrier of a Party to the Agreement is otherwise qualified to receive a permit, Article 17 *bis* does not provide an independent basis upon which the United States may deny the carrier's application for a permit.

## I.

We begin with the relevant background. In April 2007, the United States and the European Community and its Member States signed an Air Transport Agreement, which, among other things, sought "to build upon

the framework of existing agreements with the goal of opening access to markets and maximising benefits for consumers, airlines, labour, and communities on both sides of the Atlantic." 2007 ATA pmbl. Under the 2007 ATA, the Parties granted certain rights to each other "for the conduct of international air transportation by the[ir] airlines." *Id.* art. 3, ¶ 1.[2] These rights included "the right to fly across [the other Party's] territory without landing," "the right to make stops in [the other Party's] territory for non-traffic purposes," and, for airlines of the European Community and its Member States, "the right to perform international air transportation . . . from points behind the Member States via the Member States . . . to any point or points in the United States and beyond." *Id.* art. 3, ¶ 1(a)–(c). Article 4 of the 2007 ATA, entitled "Authorisation," provided:

> On receipt of applications from an airline of one Party, in the form and manner prescribed for operating authorisations and technical permissions, the other Party shall grant appropriate authorisations and permissions with minimum procedural delay, provided[:]
>
> (a) for a US airline, substantial ownership and effective control of that airline are vested in the United States, US nationals, or both, and the airline is licensed[] as a US airline and has its principal place of business in US territory;
>
> (b) for a Community airline, substantial ownership and effective control of that airline are vested in a Member State or States, nationals of such a State or States, or both, and the airline is licensed as a Community airline and has its principal place of business in the territory of the European [Community];
>
> (c) the airline is qualified to meet the conditions prescribed under the laws and regulations normally applied to the operation of international air transportation by the Party considering the application or applications;
>
> and
>
> (d) the provisions set forth in Article 8 (Safety) and Article 9 (Security) ar[e] being maintained, and administered.

*Id.* art. 4.

---

[2] The 2007 ATA defined "Party" as "either the United States or the European Community and its Member States." 2007 ATA art. 1, ¶ 6.

In order to further the "goal of continuing to open access to markets and to maximise benefits for consumers, airlines, labour, and communities on both sides of the Atlantic," the 2007 ATA also required the Parties to start "[s]econd stage negotiations" after provisional application of the 2007 ATA began. *Id.* art. 21, ¶ 1. These second stage negotiations resulted in a further agreement between the United States and the European Union, signed on June 24, 2010, to amend the 2007 ATA agreement. *See* 2010 Protocol.[3] Among other things, this 2010 Protocol added to the Agreement Article 17 *bis*, entitled "Social Dimension," which provided:

> 1. The Parties recognise the importance of the social dimension of the Agreement and the benefits that arise when open markets are accompanied by high labour standards. The opportunities created by the Agreement are not intended to undermine labour standards or the labour-related rights and principles contained in the Parties' respective laws.
>
> 2. The principles in paragraph 1 shall guide the Parties as they implement the Agreement, including regular consideration by the Joint Committee, pursuant to Article 18, of the social effects of the Agreement and the development of appropriate responses to concerns found to be legitimate.

2010 Protocol art. 4 (adding Agreement art. 17 *bis*).

The Joint Committee referenced in Article 17 *bis* is described in Article 18, which was part of the 2007 ATA and was amended by Article 5 of the 2010 Protocol. The Committee is required to meet at least once a year "to conduct consultations relating to this Agreement and to review its implementation." Agreement art. 18, ¶ 1. A Party may also request a meeting of the Joint Committee "to seek to resolve questions relating to the interpretation or application of th[e] Agreement." *Id.* ¶ 2. The Joint Committee is tasked with reviewing "the overall implementation of the Agreement, including . . . any social effects of the implementation of the Agreement," *id.* ¶ 3, and "develop[ing] cooperation" among the Parties by, among other things, "considering the social effects of the Agreement as it is imple-

---

[3] The 2010 Protocol noted that "the European Union replaced and succeeded the European Community as a consequence of the entry into force on December 1, 2009 of the Treaty of Lisbon." *Id.* pmbl. at 4.

mented and developing appropriate responses to concerns found to be legitimate," *id.* ¶ 4.

The 2010 Protocol also added (again among other provisions) Article 6 *bis*, which provides that "[u]pon receipt of an application for operating authorisation, pursuant to Article 4, from an air carrier of one Party, the aeronautical authorities of the other Party shall recognise any fitness and/ or citizenship determination made by the aeronautical authorities of the first Party . . . as if such a determination had been made by its own aeronautical authorities and not enquire further into such matters," absent "a specific reason for concern that, despite the determination made by the aeronautical authorities of the other Party, the conditions prescribed in Article 4 of this Agreement for the grant of appropriate authorisations or permissions have not been met." 2010 Protocol art. 2. The 2010 Protocol clarified that a "[c]itizenship determination" is "a finding that an air carrier . . . satisfies the requirements of Article 4 regarding its ownership, effective control, and principal place of business," and that a "[f]itness determination" is "a finding that an air carrier . . . has satisfactory financial capability and adequate managerial expertise to operate such services and is disposed to comply with the laws, regulations, and requirements that govern the operation of such services." *Id.* art. 1 (adding Agreement art. 1, ¶¶ 2 *bis*, 3 *bis*).

The United States, the European Union and its Member States, Iceland, and Norway later signed an agreement incorporating the provisions of the 2007 ATA and the 2010 Protocol and applying them to Iceland and Norway as if they were members of the European Union. *See* Air Transport Agreement Between the United States, European Union and Its Member States, Iceland, and Norway arts. 1–2, June 16–21, 2011, 2011 O.J. (L 283) 3.

## II.

In our view, the text of the Agreement, reinforced by its purpose, makes clear that Article 17 *bis* does not provide an independent basis on which to deny an air carrier's application for a permit where the applicant is otherwise qualified to receive one under the Agreement. The interpretation of an international agreement begins with its text. *See Abbott v. Abbott*, 560 U.S. 1, 10 (2010) ("The interpretation of a treaty . . . begins with its text." (internal quotation marks omitted)); *Bank Melli Iran v.*

*Pahlavi*, 58 F.3d 1406, 1408 (9th Cir. 1995) ("Executive agreements . . . are interpreted in the same manner as treaties[.]"); *Air Can. v. U.S. Dep't of Transp.*, 843 F.2d 1483, 1486 (D.C. Cir. 1988) ("[We interpret] an international executive agreement . . . according to the principles applicable to treaties."); *see also* Vienna Convention on the Law of Treaties art. 31(1), *opened for signature* May 23, 1969, 1155 U.N.T.S. 331, 340 ("Vienna Convention") ("A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."); Restatement (Third) of Foreign Relations Law § 325(1) (1987) ("An international agreement is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose.").

As noted above, Article 4 of the Agreement, entitled "Authorisation," sets forth the standards under which the Parties to the Agreement grant the authorizations and permissions necessary to enable carriers of another Party to operate in their jurisdictions. Article 4 provides that "[o]n receipt of applications from an airline of one Party, in the form and manner prescribed for operating authorisations and technical permissions, the other Party shall grant appropriate authorisations and permissions with minimum procedural delay, provided" that three conditions are satisfied: first, the airline must be a citizen of an appropriate state; second, the airline must be "qualified to meet the conditions prescribed under the laws and regulations normally applied to the operation of international air transportation by the Party considering the application or applications"; and third, the "provisions set forth in Article 8 (Safety) and Article 9 (Security)" must be "maintained, and administered." Agreement art. 4. Assuming these conditions are met (as we do for purposes of this opinion), the plain terms of Article 4 require the United States to grant the "appropriate authorisations and permissions" to the requesting carrier. *Id.*; *see id.* (if enumerated conditions are met, Parties "shall grant" authorizations to carriers of other Parties).

Notably, in contrast to its express references to Articles 8 and 9, Article 4 does not mention Article 17 *bis*, or make compliance with that article a precondition for grant of an authorization. The fact that Article 4 explicitly conditions the grant of the relevant authorizations or permissions on "the provisions set forth" in Articles 8 and 9 "being maintained

and administered" suggests that the drafters did not intend to condition a grant of authorization under Article 4 on the satisfaction of Article 17 *bis* or other unnamed articles. *Cf., e.g.*, 1 *Oppenheim's International Law* § 633, at 1279 (Robert Jennings & Arthur Watts eds., 9th ed. 1992) ("The maxim *expressio unius est exclusio alterius* has been followed in the interpretation of treaties by international tribunals in a number of cases[.]"). Article 4 also does not refer to the "social dimension" or "labour standards" discussed in Article 17 *bis*, or suggest that either of these factors may be considered independently of Article 4's enumerated requirements in granting an authorization.[4] Thus, on its face, Article 4 mandates that Parties issue appropriate authorizations and permissions to air carriers of other Parties once the three specific conditions enumerated in Article 4 are satisfied, and none of these conditions references Article 17 *bis* or the factors it describes. This straightforward reading of Article 4 strongly suggests that Article 17 *bis* does not provide an independent basis for denying an air carrier's application for a permit where the carrier is otherwise qualified to receive one under the Agreement.

It is true that the Agreement does not expressly define the "appropriate authorisations and permissions" that must be granted. Agreement art. 4. In context, however, we think it clear that this phrase refers to the authorizations and permissions necessary to enable a foreign air carrier to operate within a particular jurisdiction—in the case of the United States, a permit issued by DOT. *See* 49 U.S.C. § 41301 (providing that a foreign air carrier may provide foreign air transportation only if it holds a relevant permit); *id.* § 41302 (providing the Secretary of Transportation authority to issue such permits); *see also* State Legal Analysis at 3 ("Article 4 imposes an obligation to issue a permit provided that the criteria in Article 4 are met."); DOT Legal Analysis at 5 (once fitness and safety criteria under the Agreement are satisfied, "DOT is legally required to grant" a carrier's application to provide services in the United States). The phrase "authorisations and permissions" is naturally read to refer back to the "operating authorisations and technical permissions" mentioned earlier in the same sentence; i.e., the kinds of authorizations and permissions necessary to "operat[e]" an airline in the relevant jurisdiction. *See* Agreement art. 4

---

[4] Because we assume that Article 4's enumerated requirements are satisfied, we do not consider whether the principles discussed in Article 17 *bis* could ever be relevant in determining whether those requirements are met.

("On receipt of applications from an airline of one Party, in the form and manner prescribed for operating authorisations and technical permissions, the other Party shall grant appropriate authorisations and permissions with minimum procedural delay[.]").

The term "appropriate," considered in isolation, might be taken to indicate that the Parties retain the discretion to deny authorizations or permissions if they conclude that issuing them would be "[in]appropriate," a reading that might suggest that the considerations set forth in Article 17 *bis* could independently be taken into account in deciding whether to issue a permit. In context, however, this is an implausible reading of that term. *See E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 534 (1991) ("[W]e begin with the text of the treaty and the context in which the written words are used." (internal quotation marks omitted)). As noted above, Article 4 mandates that authorizations and permissions be granted "with minimum procedural delay, provided" that certain conditions are satisfied. Agreement art. 4. It then enumerates and describes each condition, and subsequent articles discuss in great detail the specific requirements and procedures related to safety (Article 8) and security (Article 9). It would be fundamentally at odds with this explicit enumeration for the Parties to have indicated, with a single open-ended adjective inserted outside the enumerated list of conditions, that the Parties were also free to deny permits as not "appropriate" for other unspecified reasons. *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not, one might say, hide elephants in mouseholes."). It is far more natural in context—and far more consistent with the text of Article 4 and the rest of the Agreement—to read the phrase "*appropriate* authorisations and permissions" to refer to those particular authorizations and permissions a carrier needs to operate in a specific jurisdiction. Agreement art. 4 (emphasis added). The Agreement gives qualified carriers of each Party the opportunity to offer services in the jurisdiction of any other Party, provided the listed conditions are met. *Id.* The specific authorizations and permissions necessary for them to do so may vary according to each Party's relevant laws and regulations. Referring to "appropriate authorisations and permissions" is a convenient way to capture, in a single phrase, whatever authorizations and permissions a carrier needs in a given jurisdiction to enable it to provide services consistent with the Agreement. *Cf. United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("A provi-

sion that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").

The text of Article 17 *bis* likewise fails to suggest that it provides a basis for denying a permit if the requirements referenced in Article 4 are satisfied. Paragraph 1 of Article 17 *bis* provides that the Parties "recognise" the importance of the social dimension of the Agreement "and the benefits that arise when open markets are accompanied by high labour standards," and then states that "[t]he opportunities created by the Agreement are not intended to undermine labour standards or the labour-related rights and principles contained in the Parties' respective laws." Agreement art. 17 *bis*, ¶ 1. Paragraph 1 is thus, on its face, simply a statement of the Parties' recognitions and intentions, and does not create any affirmative rights, obligations, or authorities. Paragraph 2 explains that the "principles in paragraph 1 shall guide the Parties as they implement the Agreement, including regular consideration by the Joint Committee, pursuant to Article 18, of the social effects of the Agreement and the development of appropriate responses to concerns found to be legitimate." *Id.* ¶ 2. DOT suggests that this provision is "essentially hortatory," and that the statement that the principles in paragraph 1 "shall guide" the Parties' implementation of the Agreement does not impose any obligation on the Parties. DOT Legal Analysis at 5. The State Department suggests that, under paragraph 2, if a Party had "concerns about some aspect of labor rights regarding its own implementation or the implementation of the Agreement by another Party," the Party "could consider on its own what, if any, action is appropriate (and consistent with the Agreement) or could potentially raise the issue with some or all other Parties." State Legal Analysis at 3. But, in State's view, paragraph 2 "does not authorize actions that would run counter to express legal obligations of the Parties under other provisions of the Agreement—such as the obligation at issue here, to grant a permit where Article 4's requirements are satisfied." *Id.* "In that context," State explains, "[p]aragraph (2) at most provides for the Joint Committee to consider labor-related concerns raised by the Parties." *Id.* We need not attempt to determine the precise meaning of paragraph 2, because in our view, no plausible reading of that provision would provide a basis for denying a permit to an air carrier otherwise

qualified under Article 4. As explained above, once the requirements enumerated in Article 4 are satisfied, Article 4 does not leave the Parties with any discretion to deny a permit, or to condition the grant of a permit on requirements that are not enumerated or referenced in Article 4 itself. *See supra* pp. 31–34. Thus, even if Article 17 *bis* were read more expansively than DOT or State suggests, as not simply authorizing but also *requiring* the Parties to take *all* possible actions consistent with the Agreement to respond to labor concerns whenever feasible, such actions could not include denying a permit when the requirements of Article 4 are met, because the Agreement does not allow the Parties to take such an action.[5]

This conclusion is reinforced by the amendment history of the Agreement. Article 17 *bis* was added to the Agreement in 2010. If the drafters had intended Article 17 *bis* to affect the permitting process described in Article 4, they could have said so expressly. Indeed, they included precisely such a clarification in Article 6 *bis*, which was also added in 2010. Article 6 *bis* sought to streamline the permit approval process in Article 4 by providing that, in many circumstances, Parties are required to accept the fitness and citizenship determinations made by the aeronautical authorities of other Parties. Consistent with this purpose, Article 6 *bis* expressly references Article 4 and makes clear that it is intended to affect the way applications under Article 4 are reviewed. *See* Agreement art. 6 *bis* ("Upon receipt of an application for operating authorisation, pursuant to Article 4, from an air carrier of one Party, the aeronautical authorities of the other Party shall recognise any fitness and/or citizenship determination made by the aeronautical authorities of the first Party . . . as if such a determination had been made by its own aeronautical authorities and not enquire further into such matters," with certain limited exceptions). This express reference to Article 4 suggests that when the drafters of the 2010 amendments intended the new provisions in the Agreement to affect the implementation of Article 4, they said so explicitly. Article 17 *bis*, however, does not mention Article 4. Nor does it expressly indicate—as other articles do—that it is intended to override other provisions in the Agreement. *Cf.* Agreement art. 6 ("Notwithstanding any other provision in this

---

[5] To be clear, we express no view on whether Article 17 *bis* can be interpreted in this more expansive manner.

Agreement, the Parties shall implement the provisions of Annex 4 in their decisions under their respective laws and regulations concerning owner-ship, investment and control."); *id.* art. 10, ¶ 10 ("Notwithstanding any other provision of this Agreement . . . ."); *id.* annex 1, § 3 ("Notwithstand-ing Article 3 of this Agreement . . . ."). Thus, like the text of Article 4, the text of Article 17 *bis* fails to indicate that it provides any basis for deny-ing a permit if the requirements in Article 4 are satisfied.

This conclusion is also consistent with the general purposes of the Agreement. *See, e.g.*, *Abbott*, 560 U.S. at 9–10 (noting that a treaty inter-pretation inquiry is shaped by, *inter alia*, the text and purposes of the treaty); *id.* at 28–29, 46 (Stevens, J., dissenting) (interpreting a treaty by looking to the treaty's text and purpose); *Application of the Federal Water Pollution Control Act to the Former Panama Canal Zone*, 5 Op. O.L.C. 80, 81 (1981) ("Panama Canal Opinion") (noting that "[t]reaties are to be construed with the highest good faith with an eye to the manifest meaning of the whole treaty," and construing provisions "consistently and in keep-ing with the purpose of the Treaty" (internal quotation marks omitted)); Vienna Convention art. 31(1), 1155 U.N.T.S. at 340. The State Depart-ment, which led the negotiation of the Agreement on behalf of the United States, has indicated that "[t]he central purpose of the Agreement was to increase opportunities to provide air services between the Parties." State Legal Analysis at 4; *see also Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982) (negotiating agency's views get "great weight"); Panama Canal Opinion, 5 Op. O.L.C. at 82 ("In interpreting a treaty and other international agreements, the construction placed upon it by the Department charged with supervision of our foreign relations should be given much weight."). This view is confirmed by the preamble of the Agreement, which states that, in entering into the Agreement, the Parties desired "to promote an international aviation system based on competition among airlines in the marketplace with minimum government interference and regulation," and intended to "open[] access to markets and max-imis[e] benefits for consumers, airlines, labour, and communities on both sides of the Atlantic[.]" 2007 ATA pmbl.; *see also* 2010 Protocol pmbl. at 4 (noting that Parties intended "to build upon the framework estab-lished by [the 2007 ATA], with the goal of opening access to markets and maximising benefits for consumers, airlines, labour, and communities on both sides of the Atlantic"). The purpose of promoting open access by

airlines of one Party to the markets of the other Parties is served by the clear procedures set forth in Article 4, which limit each Party's discretion to deny permits to carriers of the other Parties, thereby ensuring that government interference with competition is "minim[ized]." To be sure, benefits to labor were relevant to the Parties and explicitly mentioned in the preamble, but these references, read in light of the preamble as a whole, suggest only that the Parties believed benefits to labor were among the benefits that flowed from open access to markets. *See generally* Agreement pmbl.; *see also* 2010 Protocol art. 6 ("The Parties commit to the shared goal of continuing to remove market access barriers *in order to* maximise benefits for consumers, airlines, labour, and communities on both sides of the Atlantic[.]" (emphasis added)). [6]

Finally, we also considered whether a provision concerning Article 17 *bis* in the current DOT appropriations bill, which is identical to a provision in the previous year's bill, alters our analysis. *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. L, § 413, 129 Stat. 2242, 2906 (2015); Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, div. K, § 415, 128 Stat. 2130, 2765 (2014). That provision states that "[n]one of the funds made available by this Act may be used to approve a new foreign air carrier permit . . . or exemption application . . . of an air carrier already holding an air operators certificate issued by a country that is party to the [Agreement] where such approval would contravene United States law or Article 17 bis" of the Agreement. Pub. L. No. 114-113, div. L, § 413(a), 129 Stat. at 2906. It then clarifies that "[n]othing in this section shall prohibit, restrict or otherwise preclude the Secretary of Transportation from granting a foreign air carrier permit or an exemption to such an air carrier where such

---

[6] Because we conclude that the text of the Agreement is clear, and consistent with the central purpose of the Agreement, we need not inquire into the negotiating history. *Cf. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134 (1989) ("We must . . . be governed by the text . . . whatever conclusions might be drawn from the intricate drafting history . . . . The latter may of course be consulted to elucidate a text that is ambiguous. But where the text is clear, as it is here, we have no power to insert an amendment." (citations omitted)); *see also* Vienna Convention art. 32, 1155 U.N.T.S. at 340. Nevertheless, the State Department has informed us that it "believes that the negotiating history of the treaty confirms the conclusion that Article 17 *bis* does not constitute a basis for a Party to unilaterally deny a permit to an otherwise qualified carrier of another Party." State Legal Analysis at 4.

authorization is consistent with the [Agreement] and United States law." *Id.* § 413(b). Whatever the meaning or effect of this provision as a matter of domestic law, it does not affect our interpretation of the Agreement itself. As discussed above, the text of the Agreement is clear. The Departments of State and Transportation—the principal government entities involved in negotiating and implementing the Agreement on behalf of the United States—agree that Article 17 *bis* does not provide an independent basis upon which a Party to the Agreement may deny an application for a permit from an otherwise qualified carrier, and those views are entitled to great weight. *See Avagliano*, 457 U.S. at 184–85 ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."); *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("[T]he meaning given to [treaties] by the departments of government particularly charged with their negotiation and enforcement is given great weight."). And in any event, we do not read the DOT appropriations provision as purporting to alter the meaning of the Agreement itself.

## III.

For the foregoing reasons, we conclude that Article 17 *bis* does not provide an independent basis upon which the United States may deny a permit to an air carrier of a Party to the Agreement if that carrier is otherwise qualified to receive such a permit.

KARL R. THOMPSON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*